# 25-35(L), 25-36 (CON)

## UNITED STATES COURT OF APPEALS
### FOR THE SECOND CIRCUIT

---

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**
Plaintiff-Appellee,

**UNITED STATES OF AMERICA,**
Intervenor,

**v.**

**ADAM P. ROGAS,**
Defendant-Appellant,

**PILLSBURY WINTHROP SHAW PITTMAN LLP,**
Appellant,

**PAUL G. KOROL,**
Defendant,

**NS8 FP, LLC, MVP 2020, LLC, ROGASSI ENTERPRISES, LLC,**
Relief-Defendants.

---

On Appeal from Orders of the United States District Court for the
Southern District of New York, 1:20-cv-7628-RMB (Berman, J.)

---

### BRIEF OF THE SECURITIES AND EXCHANGE COMMISSION, APPELLEE

---

JEFFREY B. FINNELL
Acting General Counsel

JEFFREY A. BERGER
Assistant General Counsel

PAUL G. ÁLVAREZ
Senior Appellate Counsel

Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
(202) 551-5038 (Álvarez)
alvarezp@sec.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

COUNTERSTATEMENT OF JURISDICTION .................................................. 1

COUNTERSTATEMENT OF THE ISSUES PRESENTED ...................................... 2

COUNTERSTATEMENT OF THE CASE ..................................................... 4

Rogas's Permanent Officer-and-Director Bar ...................................... 4

    A.    Between 2018–2020, Rogas grossly exaggerated NS8's revenue by falsifying NS8's bank account statements, and he pocketed $17.5 million from his scheme ................................... 4

    B.    Rogas retaliated against a whistleblower who had raised concerns about NS8's revenue overstatements. ........................... 6

    C.    The Government commenced criminal and civil proceedings against Rogas, which led to a criminal guilty plea, settlement with the Commission, and an asset freeze. ...... 8

    D.    The district court imposed a permanent bar on Rogas. ............. 10

Pillsbury Received and Applied $4 Million in Fraudulent Proceeds Towards Fees for Its Legal Services ................................................. 13

    A.    Rogas engaged Pillsbury to represent him, after which he was criminally and civilly charged with securities fraud, and the district court entered the freeze order. ........................... 13

    B.    Pillsbury billed against the funds Rogas transferred to it notwithstanding the asset freeze and despite being made aware that those funds were fraud proceeds. .............................. 17

    C.    The district court granted the Commission's motion to compel Pillsbury to turn over the Rogas funds. .......................... 21

STANDARD OF REVIEW ................................................................. 23

SUMMARY OF ARGUMENT .............................................................. 24

ARGUMENT .............................................................................. 28

i

## TABLE OF CONTENTS (CONTINUED)

I.    The district court acted within its discretion in imposing a permanent officer-and-director bar on Rogas. .......................................28

II.   The district court properly ordered Pillsbury to return over $3.6 million in unbilled fraud proceeds at the time of the freeze........33

    A.   The court correctly determined that the unspent Rogas funds were not Pillsbury's property when the freeze was entered..................................................................................................33

        1.   The freeze's "unambiguous" language clearly encompasses the $3,612,601.76 in unbilled funds as of the entry of the order. ........................................34

        2.   Pillsbury was not a bona fide recipient of the Rogas funds.......................................................................................35

            a.   Pillsbury did not give value in exchange for the $3.6 million as of the freeze. .......................................36

            b.   Pillsbury also failed to show that it lacked notice that the Rogas funds were tainted.................38

        3.   Under the retainer agreement's terms, the unbilled $3.6 million as of the freeze was subject to the freeze. .....43

            a.   The evidence shows that the parties created a security retainer. ..........................................................43

            b.   The unbilled funds were subject to the freeze even if appellants intended an advance payment retainer..........................................................................54

    B.   Appellants' remaining arguments fail. .......................................57

CONCLUSION .........................................................................................................63

CERTIFICATE OF COMPLIANCE .......................................................................................

CERTIFICATE OF SERVICE ................................................................................................

# TABLE OF AUTHORITIES

## CASES

*A. H. Emery Co. v. Marcan Prods. Corp.*, 389 F.2d 11 (2d Cir. 1968)................61

*Barron v. Countryman*, 432 F.3d 590 (5th Cir. 2005)............................................45

*Buon v. Spindler*, 65 F.4th 64 (2d Cir. 2023) .................................................. 23, 31

*Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617 (1989)............ 35, 62

*Concepcion v. United States*, 597 U.S. 481 (2022)....................................................57

*Consarc Corp. v. Marine Midland Bank, N.A.*,
    996 F.2d 568 (2d Cir. 1993) ...............................................................................50

*Eastway Constr. Corp. v. City of New York*, 821 F.2d 121 (2d Cir. 1987)...........31

*Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562 (N.Y. 2002) ................................51

*HBE Leasing Corp. v. Frank*, 61 F.3d 1054 (2d Cir. 1995) ....................................36

*In re Dewey & Leboeuf LLP*, 493 B.R. 421 (Bankr. S.D.N.Y. 2013).............. 22, 53

*In re King*, 392 B.R. 62 (Bankr. S.D.N.Y. 2008) ....................................................22

*In re Level 8 Apparel LLC*, 2023 WL 2940489
    (Bankr. S.D.N.Y. Apr. 13, 2023)......................... 44, 45, 47, 53, 54, 55, 56, 57

*In re Printing Dimensions, Inc.*, 153 B.R. 715 (Bankr. Md. 1993) .....................55

*JA Apparel Corp. v. Abboud*, 568 F.3d 390 (2d Cir. 2009) ............................ 50, 51

*Jacobson v. Sassower*, 66 N.Y.2d 991 (N.Y. 1985) .................................................48

*Ruberto v. DeFilippo*, 913 N.Y.S.2d 889 (N.Y. Civ. Ct. 2010)............... 44, 45, 55

## TABLE OF AUTHORITIES (CONTINUED)

*SEC v. Ahmed*, 72 F.4th 379 (2d Cir. 2023), *cert. denied*,
144 S. Ct. 2658 (2024) (mem.)......................................................... 35, 36, 37, 62

*SEC v. Apuzzo*, 184 F. Supp. 3d 1 (D. Conn. 2016) ............................................31

*SEC v. Bankosky*, 716 F.3d 45 (2d Cir. 2013) ................................................ 23, 28

*SEC v. Banner Fund Int'l*, 211 F.3d 602 (D.C. Cir. 2000)....................................43

*SEC v. Cherif*, 933 F.2d 403 (7th Cir. 1991)...........................................................35

*SEC v. Miller*, 808 F.3d 623 (2d Cir. 2015) ..................................................... 23, 42

*SEC v. Patel*, 61 F.3d 137 (2d Cir. 1995)...................................... 11, 23, 28, 29, 30

*SEC v. Quinn*, 997 F.2d 287 (7th Cir. 1993)...........................................................35

*SEC v. Shkreli*, 2022 WL 541792 (E.D.N.Y. Feb. 23, 2022).......................... 13, 31

*SEC v. Wyly*, 56 F. Supp. 3d 394 (S.D.N.Y. 2014) ...............................................43

*Smith v. SEC*, 653 F.3d 121 (2d Cir. 2011).............................................................23

*United States v. Parker*, 439 F.3d 81 (2d Cir. 2006) ............. 44, 45, 47, 51, 55, 56

*Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163 (2d Cir. 2001)...................................23

## STATUTES, RULES, AND OTHER AUTHORITIES

Securities Act of 1933, 15 U.S.C. 77a, *et seq.*

    Section 20(b), 15 U.S.C. 77t(b) .......................................................................1

    Section 20(d)(1), 15 U.S.C. 77t(d)(1) ............................................................1

    Section 20(e), 15 U.S.C. 77t(e).......................................................................28

    Section 22(a), 15 U.S.C. 77v(a).......................................................................1

iv

TABLE OF AUTHORITIES (CONTINUED)

Securities Exchange Act of 1934, 15 U.S.C. 78a, *et seq.*

    Section 21(d), 15 U.S.C. 78u(d) ....................................................................1

    Section 21(d)(2), 15 U.S.C. 78u(d)(2) ......................................................28

    Section 27, 15 U.S.C. 78aa ............................................................................1

*Douglas R. Richmond*, UNDERSTANDING RETAINERS AND FLAT FEES,
    34 J. Legal Prof. 113 (2009) ................................. 43, 44, 45, 46, 47, 50, 51, 55

Restatement (First) of Restitution §173 (1937) ...................................................37

Restatement (Second) of Trusts §302 (1959).....................................................37

22 N.Y.C.R.R. 1215.1(b).........................................................................................50

Alaska Bar Ass'n Ethics Op. 87-1 (1987) ...........................................................49

N.Y. Rule of Prof. Conduct 1.5(b) (2025) ...........................................................49

N.Y. State Bar Ass'n Comm. on Pro. Ethics,
    Op. 599 (Mar. 16, 1989)..................................................................................48

N.Y. State Bar Ass'n Comm. on Pro. Ethics,
    Op. 816 (Oct. 26, 2007) ...................................................... 23, 48, 49

N.Y.C. Bar Ass'n Comm. on Pro. Ethics,
    Formal Op. 1999-02 (1999) .............................................................................39

N.Y.C. Bar Ass'n Comm. on Pro. Ethics,
    Formal Op. 2018-4 (2018) .................................................. 39, 40, 41

### COUNTERSTATEMENT OF JURISDICTION

In the Securities and Exchange Commission's civil law enforcement action against defendant-appellant Adam P. Rogas, the district court had jurisdiction under Sections 20(b), 20(d)(1), and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. 77t(b), 77t(d)(1), 77v(a), and Sections 21(d) and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. 78u(d), 78aa. On December 2, 2024, the district court ordered Rogas's attorneys, appellants Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury"), to deposit $3,612,601.76, plus interest, into an escrow account for the "benefit of innocent investors." SPA-1–14.[1] On December 12, 2024, the district court entered an order permanently barring Rogas from serving as an officer or director of a public company. SPA-15–32.

Rogas timely appealed both orders on December 30, 2024. A-326, 328. On January 29, 2025, Rogas, joined by Pillsbury, filed a timely

---

[1] "SPA-__" refers to pages of the Special Appendix filed with the opening brief. "A-__" refers to pages of the Joint Appendix. "Br.__" refers to pages of the opening brief. "Dkt. [__] at __" refers to documents from the district court's docket below. "Crim. Dkt. [__] at __" refers to documents from *United States v. Rogas*, 20-cr-539 (S.D.N.Y.) (Cronan, J.).

amended notice of appeal of the district court's December 2, 2024, order. A-332. This Court has jurisdiction under 28 U.S.C. 1291.

### COUNTERSTATEMENT OF THE ISSUES PRESENTED

Between 2018 and August 2020, Rogas, the former CEO of NS8, Inc., obtained over $17.5 million from investors through a fraudulent scheme. SPA-17. In September 2020, Rogas met with Pillsbury and then transferred to Pillsbury $4 million of the proceeds he had received from that scheme. SPA-3. Days later, the United States Attorney's Office ("USAO") and the Commission initiated separate criminal and civil proceedings against Rogas for securities fraud, and the district court in the civil case issued an order freezing over $35 million of Rogas's assets, including any held by third parties for his benefit. SPA-7–8.

After eventually learning that the source of the $4 million was fraud proceeds, the USAO told Pillsbury that information in November 2020, and Pillsbury agreed not to further dissipate any remaining funds. A-273. But despite Pillsbury's representations—and notwithstanding the freeze order—Pillsbury billed its legal fees against the Rogas funds until there were none left. SPA-3–4. After discovering years later that Pillsbury had been billing against the Rogas funds, the Commission moved to compel

2

Pillsbury to turn over $3,612,601.76—the Rogas funds that Pillsbury had not billed against as of the asset freeze—so they could be returned to defrauded investors.  The court granted the motion.  SPA-14.

Meanwhile, Rogas pleaded guilty to his criminal charges and later settled the Commission's civil case against him.  In settling his civil case, Rogas agreed to a permanent injunction, to pay disgorgement plus interest, and to be subject to an officer-and-director bar for a period to be determined by the district court.  A-291–96.  The district court then concluded that a permanent bar against Rogas "is both necessary and in the public interest."  SPA-32 (internal quotation marks omitted).

This consolidated appeal raises two distinct issues:

1.     Whether the district court properly exercised its discretion in permanently barring Rogas from serving as an officer or director of a public company.

2.     Whether the district court properly exercised its discretion in finding that the fraud proceeds that Rogas paid to Pillsbury were subject to the asset freeze and ordering Pillsbury to return $3,612,601.76 for the victims of Rogas's fraud.

COUNTERSTATEMENT OF THE CASE

While both center around Rogas's wrongdoing, the two appeals are distinct.  Appeal 25-36 concerns the permanent bar imposed against Rogas, and Appeal 25-35 concerns the court's order that Pillsbury pay $3,612,601.76 for the benefit of injured investors.

## Rogas's Permanent Officer-and-Director Bar

**A.     Between 2018–2020, Rogas grossly exaggerated NS8's revenue by falsifying NS8's bank account statements, and he pocketed $17.5 million from his scheme.**

Rogas is the founder and former CEO of NS8, which developed and sold electronic tools to help online vendors assess the fraud risks of customer transactions.  Crim. Dkt. [7] at 1; A-91.[2]  Rogas was primarily responsible for soliciting potential investors for NS8.  Crim. Dkt. [7] at 1. He also exercised control over NS8's books and records, and the bank

---

[2]     Based on Rogas's guilty plea to one count of criminal securities fraud and the terms of his consent agreement in this civil law enforcement action, the allegations in Count One of the criminal indictment and in the Commission's amended complaint against Rogas are deemed admitted as true.  *See* Crim. Dkt. [80]; Crim. Dkt. [59] at 3; A-284–96.

accounts into which NS8 customer funds were deposited.  Crim Dkt. [7] at 1–2; A-92–93, 97–98.

Between January 2018 and June 2020, Rogas falsified NS8's monthly bank account statements to create the incorrect impression that NS8 had received tens of millions in revenue when it really had only tens of *thousands* in the bank.  A-91, 97–100.  For instance, Rogas:  (1) falsified NS8's September 2019 bank statement to claim that NS8 had over $23.7 million in its account when the account held only $5,636.10; and (2) doctored NS8's June 2020 bank statement to give the illusion that NS8 had over $62 million on hand when it only had $28,051.47.  A-99–100 (chart detailing actual vs. falsified revenue figures).  Along with touting phantom revenues, Rogas overinflated NS8's customer numbers, falsely claiming that NS8 had over 10,000 paying customers when it had only a few hundred.  Crim. Dkt. [70-1] at 1–2.  Rogas provided the falsified bank statements to NS8's finance department, which relied on them in preparing financial statements that materially misstated NS8's revenue and assets.  A-98.

Despite knowing that NS8's financial statements were false, Rogas (as NS8's CEO) prepared, reviewed, and distributed them to current and

5

prospective investors. A-98, 105. Rogas then used the phony financial statements and customer data to solicit investors in three securities offerings between spring 2019 and spring 2020, which raised approximately $149 million from investors. A-92, 100–02. Rogas continued to alter NS8's bank statements and provide false financial information to investors even after the Commission issued two subpoenas in connection with an investigation into potential fraud. A-108–09. After raising the funds, NS8 used that money to purchase NS8 shares from Rogas and others; Rogas received over $17.5 million from selling NS8 shares he owned. SPA-5; Crim. Dkt. [93] at 1.

### B. Rogas retaliated against a whistleblower who had raised concerns about NS8's revenue overstatements.

Rogas tried to cover up his illegal actions, as demonstrated by his retaliation against a whistleblower. In 2018 and 2019, an NS8 employee internally raised concerns that NS8 was overstating and falsifying information (including customer and revenue numbers) to investors. A-106. In July 2019, this whistleblower, through counsel, submitted an anonymous tip to the Commission claiming that NS8 and Rogas may have

6

overstated its customer numbers and its revenue, and that the incorrect data may have been used in an NS8 securities offering. A-106.

Approximately one month later, the whistleblower directly raised his concerns with his supervisor and with NS8's Chief of Staff, warning that he would report the misconduct to investors, customers, and others if NS8 did not stop falsely overstating its revenue and customer data. A-106. Rogas and the Chief of Staff prevented the whistleblower from accessing NS8's computer systems and office building. A-106–07. Rogas and the Chief of Staff also remotely accessed the whistleblower's company computer to view his personal Hotmail, Dropbox, Glassdoor, and Google accounts. A-108. This enabled Rogas and the Chief of Staff to see the whistleblower's privileged conversations with the attorney who helped submit his whistleblower report to the Commission. A-108. Two days later, the whistleblower met with his supervisor, the Chief of Staff, and Rogas, and reiterated his concerns about NS8 overstating its customer data. A-108. Rogas informed the whistleblower that he needed to consider the whistleblower's future at NS8, and three days later, at Rogas's direction, NS8 fired him. A-108.

7

**C. The Government commenced criminal and civil proceedings against Rogas, which led to a criminal guilty plea, settlement with the Commission, and an asset freeze.**

Rogas resigned from NS8 on September 1, 2020, after another employee uncovered his scheme in late August 2020. A-109. On September 17, 2020, the USAO charged Rogas with securities and wire fraud, and the FBI arrested him. SPA-3. That same day, the Commission filed its civil enforcement action against Rogas for securities fraud and obtained an *ex parte* emergency temporary restraining order ("TRO"). A-36, 65. The TRO froze Rogas's assets held by anyone, including by Rogas's attorneys-in-fact, "to prevent further misappropriation of investor funds and provide a corpus for returning investor funds to investors." SPA-7. The court subsequently extended the freeze through the case's final resolution. SPA-8.

Rogas did not comply with the freeze. In April 2021, he transferred approximately $1.7 million in fraud proceeds from a Silicon Valley Bank account belonging to PhutureCorp (a company Rogas owned and controlled) to a personal account at another financial institution. A-80–81; Crim. Dkt. [70] at 5–6. Over the next four months, Rogas spent approximately $500,000 of those funds on luxury items, consumer goods,

8

and services, including a swimming pool, a garden fountain, and tickets to sporting events. A-81; Crim. Dkt. [70] at 6; Crim. Dkt. [73] at 3–4. Rogas also used nearly $1.2 million to purchase cryptocurrency assets and non-fungible tokens. Crim. Dkt. [70] at 6; Crim. Dkt. [73] at 6. Rogas and the Commission jointly notified the district court of Rogas's violation on January 7, 2022; Rogas conceded that the funds from the PhutureCorp account "were clearly within the Court's asset freeze order." A-81. In response, the court ordered Rogas to deposit any remaining funds in the court's registry. A-83.

Rogas eventually pleaded guilty to securities fraud on March 16, 2022 (the Commission's civil case was stayed during the criminal proceedings, A-77–79). SPA-17. As part of his plea agreement, Rogas admitted that he "operated a fraudulent scheme to deceive NS8's investors by falsely inflating the company's reported revenue and assets by substantial amounts" and that he "used falsified bank statements to cause material misrepresentations to be made to investors regarding NS8's assets and revenue, including by showing tens of millions of dollars in assets and revenue that did not exist." Crim. Dkt. [7], ¶3. The court sentenced Rogas to 60 months in prison, with three years' supervised release, and ordered

9

him to forfeit over $17.5 million and to pay restitution of over $112 million. Crim. Dkt. [80], [88].

After the stay of the civil case expired, Rogas and the Commission agreed to a settlement via consent judgment in September 2024. A-284–96. In his consent, Rogas agreed: to be permanently enjoined from future violations of antifraud provisions of the federal securities laws; to pay $17,542,459 in disgorgement plus interest (to be satisfied by his criminal restitution order); and to be barred from acting as an officer or director of a public company "for a period to be determined by the [district court]," upon the Commission's motion. A-285–86. Rogas also agreed that, for purposes of determining the length of his bar, the amended complaint's allegations "shall be accepted as and deemed true," and Rogas "will be precluded from arguing that he did not violate the federal securities laws as alleged in the Amended Complaint and as admitted in the plea transcript [from the criminal matter against him]." A-286.

**D.    The district court imposed a permanent bar on Rogas.**

Per the consent judgment, the district court turned to deciding the length of the bar. The Commission asked the court to permanently bar Rogas from serving as an officer or director of a public company, arguing

10

that given "his repeated egregious and intentional misconduct, Rogas has demonstrated that he is unfit to ever be entrusted with the role of an officer or director of a public company." Dkt. [218] at 2; SPA-15–16. By contrast, Rogas asked that the court impose at most a five-year bar, claiming that his misconduct was "entirely aberrational." SPA-16.

Applying the factors set forth in *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995) (*see* SPA-24–29), the district court found that permanently barring Rogas from serving as an officer and director "is needed in order to protect the public, deter further misconduct, and lend confidence to the public and the financial markets." SPA-29. In reaching that conclusion, the court found that Rogas's misconduct was, "[w]ithout doubt," "egregious" and involved "an exceptionally high degree of scienter." SPA-24, 27. The court also found that Rogas played a substantial role in the fraud given his role as NS8's CEO (SPA-27), and that "[t]here can be no dispute that Rogas had an enormous economic stake in his misconduct" given that he "pocketed at least $17.5 million of the defrauded investor funds" (SPA-28 (alteration omitted)). The court acknowledged that Rogas "is not (technically) a 'repeat offender' as he has not previously been prosecuted for violating the securities laws" (SPA-26) and is "a first[-]time offender" (SPA-30).

11

Nonetheless, the court found, Rogas's violations "were 'not an isolated incident'" because "[o]ver nearly two and a half years, Rogas altered NS8 bank statements every month and repeatedly and intentionally provided falsified documents to investors in connection with raising nearly $150 million in three **separate** securities offerings." SPA-29. Given the recurrent and systematic nature of Rogas's misconduct, the degree of scienter involved, and the fact that serving as an officer or director would give Rogas opportunities to commit future violations, the court found that Rogas would be likely to recidivate in the future. SPA-29.

Finally, the court independently considered "whether a conditional bar … and/or a bar limited in time (*e.g.*, a bar of five years) might be sufficient" to protect the public, encourage investor confidence, and promote the stability of the securities industry. SPA-30–31. The court found that "[a] limited bar would not be sufficient here" because Rogas's "'brazen, deceptive conduct' each month over the course of two and a half years … demonstrates a prevailing inclination … to place his own self-interest ahead of the interests of his investors and the public." SPA-30 (internal quotation marks omitted). And it found that Rogas's "relatively young" age (48 upon his release from incarceration) is "'concerning to the

12

Court, because a limited bar of five or ten years, for example, would not sufficiently protect the public from the defendant's likelihood of future violations.'" SPA-30–31 (alteration omitted) (quoting *SEC v. Shkreli*, 2022 WL 541792, at *11 (E.D.N.Y. Feb. 23, 2022)).

## Pillsbury Received and Applied $4 Million in Fraudulent Proceeds Towards Fees for Its Legal Services

### A. Rogas engaged Pillsbury to represent him, after which he was criminally and civilly charged with securities fraud, and the district court entered the freeze order.

Rogas and Pillsbury entered into an engagement agreement the day Rogas resigned from NS8 (September 1, 2020). A-196–203. The agreement stated that Pillsbury would represent Rogas "in connection with employment [at NS8] and corporate separation advice and any attendant considerations or issues arising therefrom." A-196. The agreement did not mention criminal or civil law enforcement proceedings.

According to sworn declarations from Rogas and Pillsbury partner William Sullivan, the engagement letter provided that "Rogas would remit and continually replenish a small retainer [of $15,000], without which work on his behalf would cease." SPA-6; A-200 ("[W]e are requesting a retainer in the amount of $15,000.00 in connection with the legal services to be

13

rendered for this representation. [But if] your retainer balance falls below $15,000.00, we will need an immediate replenishment to the original retainer amount … or our firm will cease all work."). The agreement also stated that Pillsbury's fees "are based on the number of hours devoted to this engagement," that "[a]ny estimates of anticipated fees … are only an approximation of what the actual fees will be," and that "our fees will be determined based on actual hours incurred." A-200. And the letter stated that "[Rogas's] termination of our engagement will not affect [his] responsibility to pay for legal services rendered and other charges incurred prior to termination." A-197. The letter nowhere suggests that the parties intended for Rogas to pay a flat fee for the completion of a specific objective, regardless of the number of hours incurred.

Days after signing the engagement letter, Rogas spoke with Sullivan and other Pillsbury attorneys on a "multi-hour call," during which Rogas "comprehensive[ly]" detailed his actions at NS8. SPA-6. According to Sullivan, it became "immediately apparent [from this recitation of events]

14

that Mr. Rogas would likely be facing criminal, SEC and civil investigations and litigation," and Sullivan relayed those concerns to Rogas. SPA-6.

Two days later, Rogas wired $4 million to Pillsbury. Br.8. Those funds are traceable to Rogas's fraud. SPA-6 & n.7; A-227–43. On June 22, 2020, Rogas transferred $10 million of the $17.5 million in fraud proceeds that he had received to a personal account at Silicon Valley Bank. A-229. On July 24, 2020, Rogas wired that money into PhutureCorp's Silicon Valley Bank account (*see supra* 8–9). A-230–34. And on September 9, 2020, Rogas sent $4 million from the PhutureCorp account to Pillsbury. A-242.

There is no documentary evidence in the record (*e.g.*, a receipt, an email, a letter) contemporaneously memorializing or explaining the reason for the $4 million transfer. There is no engagement letter or other agreement indicating that Pillsbury required a $4 million retainer for matters related to Rogas's employment with NS8 or any other legal matter. And there is no agreement indicating that the $4 million was a fixed-fee payment to compensate Pillsbury for all the work to be done during its

representation of Rogas regardless of the time required or complexity posed by that representation.

Instead, on September 14, 2020—nearly a week after the transfer—Rogas and Pillsbury executed an amended engagement letter which, except for new language regarding conflicts, was identical to the letter signed on September 1, 2020. As with the original, the revised letter referred to the same $15,000 replenishable retainer and scope of engagement language, but it did not mention the $4 million transfer or describe a flat-fee payment arrangement. A-204–11.

These events occurred near in time to the district court's issuance of an asset freeze on September 17, 2020. The freeze order provided that Rogas, the relief defendants, and other third parties, including Rogas's attorneys-in-fact, "shall … prevent any disposition, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal whatsoever of any of their funds or other assets or things of value presently held by them, under their control … and wherever located, up to $35,084,900." SPA-8 (first alteration in original). The order also stated that "[a]ny bank, financial or brokerage institution or other person or entity holding any funds, securities or other assets in the name of, for the benefit

16

of, or under the control of" Rogas, the relief defendants or other third

parties, including attorneys-in-fact, "shall hold and retain within their

control and prohibit the withdrawal, removal, transfer or other disposal of

any such funds or other assets." A-66–67. Rogas and Pillsbury were

served with the order on September 18, 2020. SPA-8. On September 24,

2020, the court granted the parties' joint motion to extend the freeze until

the case's final resolution. SPA-8.

### B. Pillsbury billed against the funds Rogas transferred to it notwithstanding the asset freeze and despite being made aware that those funds were fraud proceeds.

Despite being aware of the asset freeze, Pillsbury billed against the $4

million in transferred funds without seeking the district court's leave to do

so. By mid-November 2020, Pillsbury already had billed approximately

$400,000 against the funds. A-273, 244.[3] At that point, the USAO informed

Pillsbury that the "Billed and Unbilled" portions of the $4 million "were

subject to forfeiture" because the source of those funds "was $17 million in

---

[3] Due to a billing cycle that overlapped with the asset freeze, the exact amount Pillsbury billed between September 17, 2020, and November 2020 is unknown. SPA-14 n.11. But the court found that it is appropriate for Pillsbury to turn over $3,612,601.76, plus interest, and Pillsbury does not challenge that amount. *Id.*

17

fraud proceeds from a tender offer of NS8 shares." A-272–73. The USAO thus "requested that Pillsbury segregate those crime proceed funds, and not spend down those funds to pay for attorney's fees." A-273. While Pillsbury claimed that it "had no basis to believe [those] funds were subject to a forfeiture claim until the USAO stated this in a [November 13, 2020] phone call," Pillsbury "agreed not to further dissipate the funds from Rogas still remaining in the Account … while Pillsbury was engaged in discussions with the USAO about those funds." A-273.

Over the next year, Pillsbury repeatedly indicated to the USAO that it would not further dissipate the fraud proceeds it had received from Rogas. For instance, Pillsbury told the USAO in late November 2020 that it "had identified a path forward to representing Rogas," which the USAO understood to mean that "Pillsbury had identified an alternative source of funding for Rogas's legal expenses distinct from the funds [it had received]." A-273. Then in September 2021, Pillsbury referred to a director-and-officer-liability insurer, further creating the impression that an alternative source of funding for Rogas's legal fees was, at least in part, insurance proceeds. A-273.

18

The sworn accounting that Pillsbury presented to the Commission in September 2022 bolstered that impression.[4]  In that accounting—which was the first time Pillsbury had identified to the Commission that Pillsbury had received money from Rogas (SPA-3)—Pillsbury stated that over $3.6 million in funds were held as an "[u]nencumbered [a]sset[]" *of Rogas*, held in an "[e]scrow" account at Pillsbury.  A-217, 220.  The accounting separately stated that Rogas owed Pillsbury a $2 million debt for "Legal Fees" associated with his "Legal Defense" incurred up to that point.  A-222.

On June 30, 2023, Commission counsel participated in a call with Pillsbury attorneys.  A-270.  During that call, Commission counsel inquired whether Pillsbury planned to turn over the $3,612,601.76 listed in the sworn accounting so the money could be returned to defrauded investors as part of resolving Rogas's parallel criminal case.  A-270.  Pillsbury informed Commission counsel for the first time that it had been billing against the funds Rogas had deposited at Pillsbury, that it intended to

---

[4]    According to Sullivan, the sworn accounting "contains all of the financial information provided to the So[u]thern District of New York's Probation Department in connection with Mr. Rogas'[s] sentencing in [the criminal matter]" and identifies "all cash and otherwise unencumbered assets, liabilities, and an accounting of those assets presently available."  A-212.

retain part of the funds based on legal fees it had accrued, and that it would turn over a portion of those unspent funds to the USAO to satisfy (in part) Rogas's criminal restitution order. A-270. Commission counsel never expressed a view that Pillsbury's unilateral decision to bill against the Rogas funds accorded with the asset freeze order, nor did counsel inform Pillsbury that the Commission had previously been aware of—let alone consented to—such a practice. A-270.

In September 2023, Pillsbury informed the USAO that it was discussing with the Commission whether the approximately $2 million in already billed funds should be returned to victims of Rogas's fraud. A-267, 272. In light of these discussions, and the possibility that a return of the already billed funds could be used to satisfy the disgorgement order in the civil case, the USAO stated that it would not ask Pillsbury to return those billed funds as part of the criminal case. A-272.[5] Thereafter, the Commission and Pillsbury attempted to, but could not, resolve the return

---

[5]    The USAO stated that its decision not to pursue recovery of the billed funds in the criminal matter "did not … reflect a determination by the Government that, as a legal matter, the Billed Funds are not subject to recovery. Indeed, … as early as November 2020, the USAO informed Pillsbury that the USAO believed both the Billed and Unbilled funds were subject to forfeiture." A-272.

of the Rogas funds.  A-271.  Pillsbury went on to bill against the entirety of the Rogas funds.  SPA-3–4.

### C.     The district court granted the Commission's motion to compel Pillsbury to turn over the Rogas funds.

In May 2024, the Commission moved to compel Pillsbury to return the amount of funds Rogas had given to Pillsbury and that Pillsbury had not billed against as of the freeze's date ($3,612,601.76).  SPA-2.  In response, Pillsbury asked the district court for the first time to declare that the Rogas funds fell outside of the freeze order.  *See* Dkt. [191].  After a hearing—during which Pillsbury informed the Commission and the court for the first time that it had used the entire $4 million (SPA-3–4)—the court granted the motion and ordered Pillsbury to return the funds.  SPA-4.  In doing so, the court found that:  (1) Rogas's $4 million transfer to Pillsbury was subject to the freeze order, which "unambiguously included Rogas'[s] property held by Pillsbury as his 'attorneys-in-fact'"; (2) Pillsbury completely depleted the Rogas funds; and (3) Pillsbury should have sought court approval for a carve-out to bill against those funds but failed to do so.  SPA-9–14.

21

The court rejected Pillsbury's argument that Rogas's $4 million remittance was an advance payment retainer that fell outside the freeze order's scope. SPA-9. The court based its conclusion on the engagement letters' plain language, as well as Rogas's understanding that he could terminate the representation at any time and be entitled to any unbilled retainer funds paid to Pillsbury at the conclusion of its representation. SPA-9–10. Accordingly, the court found that the $4 million transfer was "a security retainer, *i.e.*, 'a payment made to an attorney to secure payment of fees for prospective services.'" SPA-9–10 (quoting *In re King*, 392 B.R. 62, 70 (Bankr. S.D.N.Y. 2008)). As such, the freeze covered any unbilled funds at the time because a security retainer "'remains the property of the client until the attorney applies it to charges incurred for services actually rendered.'" SPA-9 (quoting *In re Dewey & Leboeuf LLP*, 493 B.R. 421, 428–29 (Bankr. S.D.N.Y. 2013)). The court further concluded that even if Rogas's funds constituted an advance payment retainer, the $3,612,601.76 that had not been billed as of the freeze order was subject to that order because clients always retain an interest in the portion of an advance payment retainer that is not yet earned by their lawyers. SPA-10 n.9 (citing N.Y.

22

State Bar Ass'n Comm. on Pro. Ethics, Op. 816 at ¶8 (Oct. 26, 2007) ("N.Y.S.B.A. Op. 816")).

## STANDARD OF REVIEW

A district court has "'substantial discretion in deciding whether to impose a bar to employment in a public company,'" and this Court reviews an order imposing an officer-and-director bar for an abuse of discretion. *SEC v. Bankosky*, 716 F.3d 45, 47 (2d Cir. 2013) (per curiam) (quoting *Patel*, 61 F.3d at 141). This Court also reviews a decision regarding the scope of an asset freeze order for an abuse of discretion. *SEC v. Miller*, 808 F.3d 623, 630 (2d Cir. 2015) (citing *Smith v. SEC*, 653 F.3d 121, 127 (2d Cir. 2011)). "A district court abuses its discretion when '(1) its decision rests on an error of law … or a clearly erroneous factual finding, or (2) its decision … cannot be located within the range of permissible decisions.'" *Buon v. Spindler*, 65 F.4th 64, 74 (2d Cir. 2023) (alterations in original) (quoting *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001)). Underlying questions of fact are reviewed for clear error, and underlying questions of law are reviewed *de novo*. *Miller*, 808 F.3d at 630.

23

### SUMMARY OF ARGUMENT

The district court properly exercised its discretion in permanently barring Rogas and in ordering Pillsbury to return $3.6 million so it could be used to benefit investors harmed by Rogas's fraud.

1.    The district court did not abuse its discretion when it permanently barred Rogas from serving as an officer or director of a public company.  In applying the *Patel* factors—which the parties agree is the proper test—the court reasonably found, based on undisputed evidence, that:  Rogas's fraud was egregious; he acted with a high degree of scienter; he was a central figure to the fraud given his position as NS8's CEO; he had an "enormous economic stake" in his misconduct; and he was likely to commit future violations if not enjoined.  The court further reasonably found that, while Rogas was not a repeat offender, his misconduct was not aberrational given that, over two and a half years, he repeatedly and intentionally altered monthly bank statements and provided false and materially misleading documents to investors in connection with three separate securities offerings that raised nearly $150 million.

Rogas's principal challenge—that the district court improperly found that Rogas was a repeat offender—fails.  Rogas concedes that the court

24

twice noted that he had not committed separate securities law violations before this case. *See* Br.27. And under *Patel*, past securities law violations are not required to impose a lifetime bar. The court reasonably found that a lifetime bar is especially appropriate here, where Rogas committed "flagrant and deliberate" fraudulent acts over a lengthy period with a high degree of scienter, and every other *Patel* factor strongly supports such relief. *See* SPA-30.

Contrary to Rogas's claims, the district court reasonably evaluated his likelihood of recidivism. Rogas's comparison to bars imposed in other cases is misdirected. None of the defendants in those cases is similarly situated to him. In any event, the court's imposition of a permanent bar was appropriate because it reasonably found that a conditional bar would not sufficiently protect the public from future harm, and a permanent bar falls within the range of permissible decisions.

2.    The district court's order that Pillsbury should return $3,612,601.76 of the Rogas funds also was within the court's discretion and should be affirmed. Those funds are directly traceable to Rogas's fraud, and Pillsbury held them for Rogas's benefit. The court thus properly found

that they were subject to the freeze order's broad, "unambiguous" provisions.

The court's order should be affirmed for two additional reasons. *First*, Pillsbury was not a bona fide recipient of the funds. It did not provide value in exchange for the $3,612,601.76 that had not been billed as of the freeze. And Pillsbury knew or should have known that those funds were fraud proceeds.

*Second*, under his retainer agreement with Pillsbury, Rogas retained a property interest in any unbilled funds as of the freeze, as the court reasonably found. There is no merit to appellants' claim that the funds fall outside the freeze order's scope because Rogas's $4 million payment to Pillsbury was an "advance payment retainer" and thus ownership transferred to Pillsbury before the freeze order took effect. The engagement letters between appellants establish that the funds were a "security retainer" under which Pillsbury held the money to secure Rogas's ability to pay and could draw against those funds only after performing legal services for Rogas. Appellants do not offer any contemporaneous documentary evidence supporting their advance payment retainer argument, and abundant evidence supports the finding that the Rogas

26

funds were a security retainer. It is well-settled that, for security retainers, funds remain the client's property until the lawyer has billed against the retainer for legal services rendered. Accordingly, any funds not billed as of the freeze order remained Rogas's property and were subject to the order.

Ultimately, this Court need not decide the nature of the retainer agreement because the court's order was correct even if the agreement was an advance payment retainer. For advance payment retainers, the client retains an interest in any portion of the retainer that has not yet been earned by the lawyer, and attorneys are obligated to return any portion of the fees advanced that are not earned. Advance payment retainers are thus treated as security retainers where, as here, the retainer is a general prepayment for future legal services (rather than a flat fee). Rogas's continued interest in the unearned $3.6 million subjected those funds to the freeze, and Pillsbury could not spend those funds without the court's approval—which Pillsbury did not seek until after it had spent it all.

Appellants' remaining challenges are meritless. The district court considered and reasonably rejected their equitable arguments. And appellants' claims that affirming the court's order will have "troubling

27

ramifications" for criminal defendants and their attorneys rely on an

erroneous and overblown depiction of the law.

**ARGUMENT**

## I.   The district court acted within its discretion in imposing a permanent officer-and-director bar on Rogas.

District courts have broad discretion to bar a defendant from serving

as an officer or director of a public company—including permanently—if

that defendant violates the antifraud provisions of the federal securities

laws and demonstrates an "'unfitness to serve as an officer or director.'"

*Patel*, 61 F.3d at 141 (quoting 15 U.S.C. 77t(e), 78u(d)(2)); *Bankosky*, 716 F.3d

at 47 (quoting 15 U.S.C. 78u(d)(2)).  As Rogas acknowledges (Br.25), courts

generally consider the following non-exclusive factors:  "(1) the

'egregiousness' of the underlying securities law violation; (2) the

defendant's 'repeat offender' status; (3) the defendant's 'role' or position

when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the

defendant's economic stake in the violation; and (6) the likelihood that

misconduct will recur."  *Patel*, 61 F.3d at 141.  As *Patel* explained, these are

28

not "the only factors that may be taken into account," and it is not "necessary to apply all these factors in every case." *Id.*

The district court considered those factors and reasonably concluded that Rogas should be permanently barred from serving as an officer or director of a public company. In determining that a permanent bar is necessary "to protect the public, deter further misconduct, and lend confidence to the public and the financial markets" (SPA-29), the court found that Rogas "[w]ithout doubt … engaged in flagrant and deliberate securities fraud … over nearly two and a half years and during at least three securities offerings" that defrauded investors of over $120 million, and that Rogas personally received over $17.5 million from his wrongful conduct. SPA-24. The court also found that Rogas acted with "an exceptionally high degree of scienter," had a "very lucrative economic stake" in his fraud, and abused his fiduciary position as NS8's CEO in perpetrating his fraud. SPA-27, 28, 30. Finally, the court separately considered whether a conditional or more temporally limited bar would protect investors, reasonably concluding that "[a] limited bar would not be sufficient here" given the "brazen, deceptive" nature of Rogas's misconduct, his high degree of scienter, his age, and the fact that he would

29

have numerous opportunities to commit future violations as an officer or director.  *See* SPA-30–32.

Rogas spends much of his brief incorrectly arguing (Br.26–32) that the district court improperly considered him to be a repeat offender, and thus that it abused its discretion in applying the *Patel* factors.  Even putting aside that this argument ignores that the *Patel* factors are meant to be non-exclusive and flexible, Rogas disregards that the court twice stated that he was *not* a repeat offender.  SPA-26, 30.  While the court pointed to Rogas's repeated fraudulent acts over the course of two and a half years, its recognition of the long duration of his wrongdoing bolsters, rather than undercuts, its *Patel* analysis.  *See Patel*, 61 F.3d at 141 (court must consider the egregiousness of the underlying securities law violation).

Rogas's argument (Br.32) that lifetime officer-and-director bars "are almost universally reserved for repeat offenders" has no legitimate basis.  The Court explained in *Patel* that "it is not essential for a lifetime ban that there be past violations."  61 F.3d at 142.  Rather, where a defendant has not previously committed violations, a district court must "articulate the factual basis for a finding of the likelihood of recurrence," *id.*, which the district court undisputedly did here (SPA-28–32).  In other situations where

30

there is a factual basis for finding a likelihood of recurrence, courts have imposed lifetime bars on first time offenders.  *E.g.*, *SEC v. Apuzzo*, 184 F. Supp. 3d 1, 9–10 (D. Conn. 2016); *Shkreli*, 2022 WL 541792, at *11.  And whatever factual distinctions may exist with other cases, those differences do not indicate that the district court's imposition of a lifetime bar was an abuse of discretion, particularly given its thorough evaluation of the facts. *See Buon*, 65 F.4th at 74 (abuse of discretion only if decision "cannot be located within the range of permissible decisions" (internal quotation marks omitted)); *Eastway Constr. Corp. v. City of New York*, 821 F.2d 121, 123 (2d Cir. 1987) ("The concept of discretion implies that a decision is lawful at any point within the outer limits of the range of choices appropriate to the issue at hand ….").

Contrary to Rogas's claims (Br.34–37), the district court reasonably assessed Rogas's likelihood of recidivism.  The court acknowledged that Rogas pleaded guilty to criminal securities fraud and admitted that he defrauded investors of over $120 million.  SPA-17.  It did not somehow ignore these facts in assessing Rogas's likelihood of recidivism in the same opinion, as Rogas claims (Br.35).

31

Moreover, the court did not err by placing minimal weight on Rogas's plea. The court found that his criminal plea was not dispositive in part because of Rogas's actions before that plea, namely when he: (1) continued to alter bank statements after the Commission issued subpoenas in connection with its NS8-related fraud investigation; (2) continued to hide his fraud proceeds after his arrest and indictment; and (3) in April 2021, used nearly $1.7 million in fraud proceeds to pay for personal and luxury items in violation of the freeze order. SPA-19, 25. The court acted reasonably when it found that such undisputed evidence of misconduct—even after Rogas's arrest—outweighed his later acceptance of responsibility as part of his plea.

Rogas's remaining challenges (Br.37–41) lack merit. Rogas's claim that it was "[o]verkill" to impose a lifetime bar repeats his flawed arguments that the district court mischaracterized him as a repeat offender and failed to credit his acceptance of responsibility. Br.37, 39. It also rests on the erroneous premise that if a different court declines to issue a lifetime bar on different facts, it necessarily means that the district court abused its discretion in imposing a lifetime bar here. Br.38. Rogas's claim (Br.39–41) that the court imposed a lifetime bar to punish him cannot be reconciled

32

with his concession that the court twice cited the forward-looking purposes of such bars (Br.39), and by the court's consideration of whether a shorter, conditional bar would serve those purposes (SPA-30–32).

## II. The district court properly ordered Pillsbury to return over $3.6 million in unbilled fraud proceeds at the time of the freeze.

### A. The court correctly determined that the unspent Rogas funds were not Pillsbury's property when the freeze was entered.

Appellants do not dispute what is clear from the order:  the district court "unambiguously" froze Rogas's property that had been transferred to or held by third parties, including Rogas's attorneys-in-fact.  SPA-9.  The order expressly states that Rogas and his "attorneys-in-fact" "shall ... prevent any disposition, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal whatsoever of any of their funds or other assets or things of value presently held by them, under their control ... in whatever form such assets may presently exist and wherever located."  A-66.

Appellants nonetheless argue (Br.22–23, 54–55) that the freeze did not cover the Rogas funds because "Pillsbury was, at minimum," a bona fide recipient of those funds.  They also argue (Br.41–52) that the Rogas funds were an advance payment retainer, which immediately transferred

33

ownership of all $4 million to Pillsbury before the freeze was entered, and thus the freeze did not cover those funds. But the freeze's unambiguous language encompassed those funds regardless of whether Pillsbury was a bona fide recipient or whether appellants envisioned an advance payment retainer. And, in any event, appellants' bona fide recipient and retainer arguments lack merit.

### 1. The freeze's "unambiguous" language encompasses the $3,612,601.76 in unbilled funds as of the entry of the order.

Pillsbury's bona fide recipient and advance payment retainer arguments are beside the point given the freeze's broad and unambiguous language. The freeze directs that any "funds" or "assets," "wherever located or by whomever held, and whether acquired before or after institution of this action," including any such assets held "for the benefit of" Rogas, be frozen. A-66–67. There is no legitimate dispute that the $4 million was held for Rogas's benefit, regardless of who "owned" the unbilled funds as of the freeze. *See* Br.8–9 ($4 million transferred for Rogas's legal defense); A-194 (same).

34

## 2. Pillsbury was not a bona fide recipient of the Rogas funds.

Even if the Court were to look beyond the plain language of the freeze order, the district court did not err because Pillsbury was not a bona fide recipient of the Rogas funds. "It is well-settled that a defendant has no right to use tainted assets for his legal defense." *SEC v. Ahmed*, 72 F.4th 379, 395 (2d Cir. 2023), *cert. denied*, 144 S. Ct. 2658 (2024) (mem.); *accord SEC v. Quinn*, 997 F.2d 287, 289 (7th Cir. 1993) ("[A] swindler in securities markets cannot use the victims' assets to hire counsel who will help him retain the gleanings of crime." (citing *SEC v. Cherif*, 933 F.2d 403, 417 (7th Cir. 1991), *as amended* (June 7, 1991))). As the Supreme Court has held in the criminal context, a defendant "has no Sixth Amendment right to spend [illegally obtained funds] for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989). Here, the undisputed evidence shows that the funds paid to Pillsbury are directly traceable to Rogas's fraud, and he could not use those funds for that purpose. SPA-6 & n.7.

To overcome this hurdle, Pillsbury asserts a "bona fide" recipient argument. Br.22–23, 54–55. Although bona fide recipients of tainted funds are permitted to keep those funds, *see Ahmed*, 72 F.4th at 408, Pillsbury does not qualify. To be a bona fide recipient of tainted assets, a party must show *both* that it: (1) "gave value in exchange for" that asset; *and* (2) "lacked notice as to that asset's true provenance." *Id.* Pillsbury cannot meet either element.

### a. Pillsbury did not give value in exchange for the $3.6 million as of the date of the freeze.

When the district court entered the freeze, Pillsbury had not given value in exchange for the $3,612,601.76 that had not been billed at that time. Pillsbury's accounting of its fees shows that Pillsbury had billed between $300,000–$400,000 before the freeze order was entered, and that it billed against the remaining $3.6 million after that point. *See* A-244; SPA-3–4; *supra* n.3. And while Pillsbury claims (Br.45) that the Rogas funds were "intended as advance payment for legal services to be provided in the future," a promise to perform future services does *not* constitute value. *See HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1060 (2d Cir. 1995) (holding that attorney's promise "to render extensive legal services" in the future in

36

exchange for client's present conveyance of property "does not constitute 'fair consideration'" or a present transfer of value entitling attorney to keep title to the property)*; see also* Restatement (First) of Restitution §173 & cmt. e (1937) ("It is not the making but the performance of the promise which constitutes value."); Restatement (Second) of Trusts §302 & cmts. a & b (1959) (same).

Pillsbury's performance of services—the value it gave—*after* entry of the freeze (Br.54) does not determine whether Pillsbury was a bona fide recipient of the $3.6 million in unbilled fraud proceeds *at the time the freeze was entered*. A third party does not become a bona fide recipient of a tainted asset until it has given value in exchange for that asset. *See Ahmed*, 72 F.4th at 408; Restatement (First) of Restitution §173 & cmt. e (where transferee of tainted asset promises to make payment for that asset but receives notice of the fraud before making payment, the transferee is not a bona fide purchaser). For that reason, the Commission did not request that Pillsbury return the approximately $400,000 that Pillsbury applied towards legal services it had provided before the freeze date. Having not yet provided value in exchange for the unbilled $3.6 million as of the freeze,

37

Pillsbury was not a bona fide recipient of those funds, and thus those funds were subject to the freeze.

### b. Pillsbury also failed to show that it lacked notice that the Rogas funds were tainted.

Pillsbury's bona fide recipient argument fails for an independent reason: the record below supports the district court's finding that Pillsbury knew or should have known there was a risk the funds were tainted. *See* SPA-3–4. Appellants met on September 7, 2020, during which Rogas provided a "comprehensive recitation" of his misconduct and after which Pillsbury advised Rogas that he "was very likely" to face civil and criminal charges. A-263. Two days later, Rogas transferred $4 million to Pillsbury. Br.8. As the district court noted, Rogas's transfer of $4 million "should have set off a whole lot of bells … as to where the money was actually really coming from" given the nature of Rogas's fraud and Pillsbury's recognition that Rogas likely would be prosecuted for that fraud. Dkt. [225] at 16; *id.* at 18 ("So, all I'm saying is, a million red flags, it seems to me, came up … when you first talked to … someone who was going to be criminally prosecuted for fraud. And now this guy hands you $4 million …."); SPA-3. That Rogas paid such a large sum despite Pillsbury

38

requesting only a $15,000 retainer further supports the court's finding. Faced with these "million red flags," Pillsbury must have—or, at the very least, should have—had concerns that the money came from Rogas's fraud. But Pillsbury appears to have accepted that money without question or further investigation.

Pillsbury asserts that it was not required to investigate further because Rogas already owned some legitimate property, and thus Pillsbury did not have any "serious doubts" about the legitimacy of the Rogas funds. Br.53; Dkt. [225] at 17. But whatever Pillsbury means by "serious doubts," New York attorneys "cannot ignore 'red flags.'" N.Y.C. Bar Ass'n Comm. on Pro. Ethics, Formal Op. 2018-4 at II.b (2018) ("N.Y.C.B.A. Op. 2018-4"); *see also id.* ("'Lawyers have an obligation not to shut their eyes to what was plainly to be seen … A lawyer cannot escape responsibility by avoiding inquiry.'" (alteration in original) (internal quotation marks omitted) (citing N.Y.C. Bar Ass'n Comm. on Pro. Ethics, Formal Op. 1999-02 (1999))). As the district court found, Pillsbury's explanation that it did not have serious concerns about the source of the Rogas funds "just doesn't ring right," and it should have investigated further. SPA-3.

39

Pillsbury's duty of inquiry did not cease upon September 9, 2020, when it received Rogas's money. Rather, that duty continues throughout the representation. *See* N.Y.C.B.A. Op. 2018-4 at II.a ("[A]ssisting in a suspicious transaction is not competent [representation under Rule 1.1(a)] where a reasonable lawyer prompted by serious doubts would have refrained from providing assistance or would have investigated to allay suspicions before rendering *or continuing to render* legal assistance." (emphasis added)); *see also id.* at III ("If suspicions are sufficiently serious to give rise to a duty of inquiry under Rule 1.2(d), then the lawyer would render further assistance [without further inquiry] at her peril."); *id.* at IV (discussing a lawyer's options if the lawyer "gains knowledge *during the course of representation* that a client is engaged in unlawful conduct (or plans to be)" (emphasis added)). Accordingly, even assuming *arguendo* that Pillsbury did not have serious doubts as to the legitimacy of the Rogas funds on September 9, 2020, it must have had such doubts in November 2020, when the USAO told Pillsbury that "the source of those … funds was $17 million in fraud proceeds" obtained by Rogas, and at which point $3.6 million of those proceeds remained untouched. A-273; A-244.

40

The red flags multiplied as time passed. Pillsbury must have, or should have, had serious doubts about the source of the Rogas funds in April 2021, when Rogas violated the freeze order by transferring nearly $1.7 million to his personal bank account from a Silicon Valley Bank account for PhutureCorp—the same account from which Rogas transferred the $4 million to Pillsbury. A-80–81; SPA-6 & n.7. Pillsbury acknowledged that funds contained in that PhutureCorp account "were clearly within the Court's asset freeze order" (A-81), but it continued to bill against funds it had received from that same account the year before apparently without further investigation. Pillsbury's disregard of those facts—which must have raised additional "serious doubts" about the provenance of the Rogas funds—further undercuts their claim to be a bona fide recipient of that money. SPA-10–14; *see* N.Y.C.B.A. Op. 2018-4 at II.b ("[A] lawyer may be deemed to have knowledge that the client is engaged in a criminal or fraudulent transaction if the lawyer is aware of serious questions about the legality of the transaction and renders assistance without considering readily available facts that would have confirmed the wrongfulness of the transaction.").

41

Pillsbury's argument (Br.53) that it could not have had "serious doubts" about the legitimacy of the funds because the USAO later identified the Rogas funds as a "[s]ubstitute [a]sset[]" in Rogas's criminal case suffers from a fatal timing problem.  A-245.  The USAO's identification of "substitute assets" in *July 2023* could not have eased any doubts about the source of the Rogas funds in *Fall 2020*.

Moreover, Pillsbury's "substitute assets" argument relies on the incorrect premise that the funds were somehow not linked to Rogas's fraud.  Courts may order the forfeiture of assets that a defendant has attempted to place beyond the government's reach by, *inter alia*, "transferr[ing] … or deposit[ing]" the tainted funds with a third party or "commingl[ing the tainted funds] with other property which cannot be divided without difficulty."  21 U.S.C. 853(p)(1).  Given money's fungibility, the USAO's identification of the Rogas funds as "substitute assets" under Section 853(p)(1) shows that Rogas attempted to place the tainted funds beyond the government's reach by "transferr[ing] … or deposit[ing]" them at Pillsbury or "commingl[ing them] with other property [at Pillsbury] which cannot be divided without difficulty."  21 U.S.C. 853(p)(1); *cf. Miller*, 808 F.3d at 635 & n.69 ("[D]isgorgement is an

42

'equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset,'" and "to hold otherwise 'would lead to absurd results.'" (first quoting *SEC v. Wyly*, 56 F. Supp. 3d 394, 431 n.223 (S.D.N.Y. 2014); and then quoting *SEC v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000))).  But it did not diminish the court's ruling that multiple red flags surrounded Rogas's transfer of $4 million to Pillsbury.

### 3.    Under the retainer agreement's terms, the unbilled $3.6 million as of the freeze was subject to the freeze.

Pillsbury's retainer-based argument likewise fails.  While the district court correctly found that the evidence uniformly shows that the Rogas funds were intended as a security retainer—not an advance payment retainer—any funds not billed as of the freeze order were subject to the order even if the parties intended an advance payment retainer.

### a.    The evidence shows that the parties created a security retainer.

There are two generally acknowledged categories of retainers:  (1) general retainers, which ensure an attorney's availability for a specific period or time, case, or matter; and (2) special retainers, which "are in fact fee advances."  *Douglas R. Richmond*, UNDERSTANDING RETAINERS AND FLAT

43

FEES, 34 J. Legal Prof. 113, 114 (2009); *see also United States v. Parker*, 439 F.3d 81, 100 n.18 (2d Cir. 2006). Pillsbury's arguments center on the differences between two subcategories of fee advances, or special retainers: security retainers and advance payment retainers.

While advance payments are presumed to be advance payment retainers under New York law, that presumption may be overcome, particularly by the type of evidence presented in this case, which demonstrates that appellants created a security retainer when they signed the retainer agreement (in its original and amended forms). *See In re Level 8 Apparel LLC*, 2023 WL 2940489, at *20–21 (Bankr. S.D.N.Y. Apr. 13, 2023) (citing *Ruberto v. DeFilippo*, 913 N.Y.S.2d 889, 891 (N.Y. Civ. Ct. 2010) (finding that engagement letter's express terms supported finding of security retainer and overcame presumption of advance payment retainer)).

The differences between security retainers and advance payment retainers underscore the problems with Pillsbury's argument. Security retainers—which are what "typically come to mind" when envisioning a retainer—are "intended to secure the client's payment of fees for future services that the lawyer is expected to perform." *Richmond, supra* at 116.

44

"The client paying a security retainer is simply advancing the lawyer fees for future services." *Id.* at 116–17. "In a typical scenario, the lawyer who collects a security retainer draws it down pursuant to an agreed hourly rate as the lawyer earns the fees by performing legal services for the client," or "the lawyer may consider retained funds to be earned when all services to which the retainer relates are completed." *Id.* at 117; *see Level 8 Apparel*, 2023 WL 2940489, at *20 (finding security retainer where "by the express terms of the Engagement Letter, the parties contemplate that the Retainer would be reduced by the payment of future fees and expenses and then replenished as needed"). In either case, funds remain the client's property until the lawyer applies them to charges for services that are actually performed, and all unearned fees must be returned to the client. *Richmond*, *supra* at 117; *Level 8 Apparel*, 2023 WL 2940489, at *19 (first citing *Ruberto*, 913 N.Y.S.2d at 891; and then citing *Barron v. Countryman*, 432 F.3d 590, 595–96 (5th Cir. 2005)); *see Parker*, 439 F.3d at 100 n.18 (where attorney holds retainer "as security for the payment of future fees, then the retainer so held, less any fees charged against it, constitutes the property of the client" (internal quotation marks omitted)).

45

"An advance payment retainer is a present payment to a lawyer as compensation for the provision of specified legal services in the future." *Richmond*, *supra* at 118.  In contrast to security retainers—in which a lawyer draws against an advanced sum of money based on legal services performed—"[a] standard advance payment retainer is intended to compensate the lawyer for *all work* to be done on a matter, *regardless of the time required or the complexity of the assignment*."  *Id.* (emphasis added).  For that reason, "[a]dvance payment retainers are better known as fixed fees or flat fees."  *Id.*

The district court correctly found that the evidence—in particular, the engagement letters—"persuasively" shows that the parties intended to create a security retainer, not an advance payment retainer.  SPA-9.  For instance, the engagement letter "obligates Rogas to deposit $15,000 in order to secure legal representation."  SPA-10; *see* A-208 ("At this time, [Pillsbury is] requesting a retainer in the amount of $15,000.00 in connection with the legal services to be rendered for this representation.").  The letter also called for an "immediate replenishment of the original retainer amount" "at such time as [Rogas's] retainer balance falls below $15,000."  SPA-10.

46

And the engagement letter states that Pillsbury's fees "are based on the number of hours devoted to this engagement." A-208.

Such provisions mirror the "typical [security retainer] scenario," in which "the lawyer who collects a security retainer draws it down pursuant to an agreed hourly rate as the lawyer earns the fees by performing legal services for the client." *Richmond*, *supra* at 117; *Level 8 Apparel*, 2023 WL 2940489, at *20; *Parker*, 439 F.3d at 100 n.18. The engagement letter also sets out hourly rates (A-208) and requires Rogas to pay for legal services and other charges incurred, even if he decided to terminate Pillsbury's engagement (A-206)—all of which highlight that the retainer was *not* intended to compensate Pillsbury for *all* legal work to be done by Pillsbury "regardless of the time required or the complexity of the assignment," *Richmond*, *supra* at 118.

Appellants do not offer any contemporaneous documentary evidence (*e.g.*, engagement letter, email, receipt) showing that Rogas paid the $4 million, let alone that appellants intended the $4 million as an advance payment retainer. It strains credulity to suggest, as appellants do, that Rogas (or any client) would hand $4 million over to an attorney without any documentation of that payment or any agreement regarding the use of

47

that $4 million—and in doing so immediately relinquish *all* claims to those

funds even before the attorney has performed any work in exchange for

those funds, or even if the attorney does no further work.

Indeed, Pillsbury's failure to document their purported advance

payment retainer agreement is fatal to their argument. As the New York

Bar Association made clear:

> [A]dvance payment retainer agreements, like any other fee agreement between a lawyer and client must be 'fair, reasonable, and fully know[n] and understood by the client' … [and thus] must also comply with other relevant provisions of the [New York Rules of Professional Conduct]. In this respect, we construe DR 9-102 [now N.Y.R.P.C. Rule 1.15] to require the lawyer to maintain complete records of any advance payment retainer received and to render appropriate account to the client regarding the retainer.
>
> … [I]t is imperative for a lawyer at the outset of the representation to discuss the advantages and disadvantages of advance payment retainers and to reach an agreement about the treatment of any such advances. *These agreements should be confirmed in writing in the engagement letter where one is required.*

N.Y.S.B.A. Op. 816 at ¶8 (quoting *Jacobson v. Sassower*, 66 N.Y.2d 991, 993

(N.Y. 1985)), ¶9 (emphasis added); *see also* N.Y. State Bar Ass'n Comm. on

Pro. Ethics, Op. 599 at 7 (Mar. 16, 1989) ("A non-refundable retainer may be

charged to a client if the nature of the retainer as non-refundable is fully

and clearly explained to the client, *orally and in the written fee agreement*, and

48

if the fee is not excessive …." (alteration omitted) (emphasis added) (quoting Alaska Bar Ass'n Ethics Op. 87-1 (1987))).

Pillsbury cannot legitimately argue that Rogas "possessed adequate information to understand the benefits and risks of providing Mr. Sullivan and Pillsbury with advance payment to work against and provide all necessary and sufficient legal services in response to any government investigation or related civil litigation arising out of or concerning my time at NS8" (A-194–95). There is nothing at all "confirmed in writing" "discuss[ing] the advantages and disadvantages of advance payment retainers" or "reach[ing] an agreement about the treatment of any such advances." N.Y.S.B.A. Op. 816 at ¶9; *see* A-204.[6] Moreover, nothing in the retainer letters suggests that Rogas agreed to a flat-fee arrangement where Rogas paid $4 million to Pillsbury to represent him in all criminal and civil

---

[6] The engagement letter's language raises questions about whether Pillsbury's representation covered "all anticipated government investigations and related civil litigation concerning [his] time with NS8," as Rogas claims. A-264. On its face, the letter describes the scope of Pillsbury's engagement and fees as covering only "employment and corporate separation advice and any attendant considerations or issues arising therefrom." A-204; *see also* N.Y. Rule of Prof. Conduct 1.5(b) (2025) (Attorneys "shall communicate to a client the scope of the representation" as well as "[a]ny changes in the scope of the representation.").

49

matters he may face "regardless of the time required or the complexity of the assignment," such that Rogas could not receive any money back even if Pillsbury did not bill $4 million worth of hours. *Richmond*, *supra* at 118. The actual letters reflect a very different arrangement: a $15,000 retainer, subject to replenishment, for representation in connection with Rogas's separation from NS8. A-204–08; *see* 22 N.Y.C.R.R. 1215.1(b) (An engagement letter "shall" include an "explanation of the scope of the legal services to be provided" and an "explanation of attorney's fees to be charged, expenses and billing practices.").

Lacking contemporaneous evidence, appellants instead offer declarations prepared in May 2024 and Pillsbury's depositing of the funds in its firm operating account as proof that Rogas and Pillsbury intended the $4 million to be an advance payment retainer. But under New York law, a court "is not to consider any extrinsic evidence as to the parties' intentions" when interpreting an unambiguous contract. *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 397 (2d Cir. 2009). Extrinsic evidence may not be used to create an ambiguity, *Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 573 (2d Cir. 1993), and a contract's silence on an issue also does not "create an ambiguity which opens the door to the admissibility of extrinsic

50

evidence to determine the intent of the parties," *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 570 (N.Y. 2002).  Appellants thus may not rely on those declarations or their later actions as evidence of their intent in drafting the retainer agreement, which speaks for itself and does not mention the $4 million.

Even if extrinsic evidence were considered, the district court still properly concluded that the parties intended a security retainer, not an advance payment retainer, because additional evidence contradicts appellants' assertions in their declarations.  *See Abboud*, 568 F.3d 397 ("Where there is such extrinsic evidence, the meaning of the ambiguous contract is a question of fact for the factfinder.").  For instance, in its August 7, 2023, letter to the district court in Rogas's criminal matter, Pillsbury stated that the Rogas funds "should be correctly identified as a retainer deposit to secure the provision of legal services for the benefit of Mr. Rogas."  Crim. Dkt. [92] at 2; *compare Richmond*, *supra* at 116 (A security retainer is "intended to secure the client's payment of fees for future services that the lawyer is expected to perform."), *and Parker*, 439 F.3d at 100 n.18 (where retainer held "as security for the payment of future fees, then the retainer so held, less any fees charged against it, constitutes the

51

property of the client" (internal quotation marks omitted)). Consistent with that assertion, in the September 2022 sworn accounting of Rogas's assets, Pillsbury listed $3,612,601.76 as an unencumbered asset owned by Rogas and held in a Pillsbury escrow account on Rogas's behalf. A-217, 220. Pillsbury does not, and cannot, offer any explanation for that inconsistency.

Appellants' argument (Br.49 n.11) that the sworn accounting "does not retroactively change the character of Advance Payment or how it was treated" rings hollow. Appellants portrayed the funds as an unencumbered asset *of Rogas* to advocate for a more lenient sentence for him in his criminal case but argue here that those funds belonged *to Pillsbury* to avoid Pillsbury having to pay the funds back.

Moreover, appellants fail to explain the absence of any documentation of the $4 million transfer, let alone why the amended retainer agreement entered on September 14, 2020, refers to the same $15,000 replenishable retainer requirement even though, five days earlier, Rogas had transferred $4 million to Pillsbury. Rogas's admission in his declaration that he "'understood that he still had the right to terminate the representation at any time if he so chose, and to the return of any

52

remainder of the retainer funds paid to Pillsbury at the conclusion of services'" likewise supports the district court's finding. SPA-10 (alterations omitted) (quoting Rogas Decl., A-265).

The presumption regarding retainers under New York law—*i.e.*, presumed to be advance payment retainers absent contrary evidence—does not alter the outcome here because, as the district court correctly found, there *is* ample, "persuasive[]" evidence showing that the parties intended a security retainer. SPA-9; *see supra* 46–47, 51–52. And while appellants suggest that courts must automatically treat retainers as advance payment retainers even in the absence of any affirmative evidence that the parties intended that result, courts have rejected that argument. *See Dewey & Leboeuf*, 493 B.R. at 430 (rejecting the argument that courts must presumptively find parties created an advance payment retainer even in the absence of any evidence supporting that assertion); *Level 8 Apparel*, 2023 WL 2023 WL 2940489, at *21 (acknowledging advance payment retainer presumption but finding security retainer based on the evidence presented).

Finally, appellants' reliance (Br.45–46) on out-of-state cases is misplaced. To begin with, New York law controls, as appellants recognize

elsewhere.  In any event, they cite these non-binding cases to support the proposition that the existence of a replenishment provision means a retainer is an advance payment retainer.  But in *Level 8 Apparel*, the court applied New York law to conclude that an engagement letter with express provisions that a retainer would be reduced by the payment of future fees and replenished as needed (as here) supported a finding that the retainer was a security retainer, not an advance payment retainer.  2023 WL 2940489, at *20–21.

### b. The unbilled funds were subject to the freeze even if appellants intended an advance payment retainer.

This Court may avoid having to resolve the security versus advance payment retainer debate because, as the district court ruled, the $3.6 million in unbilled Rogas funds was subject to the freeze order even if appellants intended an advance payment retainer.  SPA-10 n.9.

Appellants are incorrect when they suggest (Br.42–43)—within the context of the freeze order—that ownership of a retainer payment immediately transfers to the attorney with *every* advance payment retainer. To reiterate, "'[a]n advance payment retainer that is earned upon receipt can be only one of two things:  a flat fee or a security retainer that is earned

54

upon receipt.'" *Level 8 Apparel*, 2023 WL 2940489, at *19 (quoting *Richmond*, *supra* at 120). Although ownership of the fee passes immediately to counsel at the time of payment by the client when an advance payment retainer is intended as a flat fee, where the attorney holds the retainer "as security for the payment of future fees, then the retainer so held, less any fees charged against it, constitutes the property of the client." *Parker*, 439 F.3d at 100 n.18 (internal quotation marks omitted); *Level 8 Apparel*, 2023 WL 2940489, at *19 ("[W]hen an advance payment retainer is intended to be a general prepayment for future services, rather than a flat fee, it should be properly regarded as a general security retainer, and any amounts [un]earned should be fully refundable to clients."); *Ruberto*, 913 N.Y.S.2d at 892 ("The mere fact that the client advances money through a retainer payment, does not entitle the attorney to claim 'ownership' of the funds at the moment of receipt … [because it] is in effect money of the client to be held in a constructive trust with the attorney being entitled to payment as he performs work."); *see also In re Printing Dimensions, Inc.*, 153 B.R. 715, 722 (Bankr. Md. 1993) (cited by appellants at Br.46) (Advance payment and security retainers "share the common characteristic that each remains the client's property until after a fee for services rendered is due.").

55

Accordingly, even assuming *arguendo* that appellants envisioned an advance payment retainer, appellants' argument (Br.42) that Pillsbury owned all $4 million in Rogas's fraud proceeds at the time of the payment can only succeed if the retainer was intended as a flat fee.[7]  But appellants have never made that claim, and rightly so.  *See* A-208 ("Our fees are based on the number of hours devoted to this engagement.").  Appellants' admission (Br.45) that the engagement letter "was intended as advance payment for legal services to be provided in the future" necessarily establishes that the retainer "is intended to be a general prepayment for future services, rather than a flat fee."  *Level 8 Apparel*, 2023 WL 2940489, at *19; *Parker*, 439 F.3d at 100 n.18.  Moreover, the engagement letters' discussion of hourly rates, replenishment of the retainer amount, and requirement that Rogas pay any outstanding legal fees even after any termination of representation are all indicia of a prepayment arrangement, not a flat fee.  *See Level 8 Apparel*, 2023 WL 2940489, at *20.  Even if appellants contemplated an advance payment retainer, the $3.6 million in

---

[7]      Even then, the funds would be subject to the freeze because they were held "for the benefit of" Rogas.  *See supra* at 34.

56

unbilled funds remained Rogas's property and was subject to the freeze. *Id.* at *19.

### B. Appellants' remaining arguments fail.

There is no merit to appellants' arguments (Br.56–57) that the district court erred by not considering their equitable defenses and by allowing the Commission to claim that the Rogas funds were subject to the freeze. Appellants' assertion (Br.56) that the district court "failed to consider [their equitable] defenses at all" is incorrect. The court *did* consider those arguments, and it rejected them. *See* SPA-4 n.5 ("Any issues or arguments raised by the parties but not specifically addressed in this Decision and Order have been considered by the Court and rejected."); *see Concepcion v. United States*, 597 U.S. 481, 501 (2022) ("[A] district court is not required to be persuaded by every argument parties make, and it may, in its discretion, dismiss arguments that it does not find compelling without a detailed explanation.").

Moreover, the court's rejection of appellants' equitable defenses was reasonable. Appellants' argument (Br.56) that the Commission should have been estopped from claiming that the Rogas funds were subject to the freeze rests on the incorrect assertions that the USAO and Commission: (1)

57

"never determined that [the funds] were actually tainted and never objected to Pillsbury's use of those funds to pay for Mr. Rogas'[s] defense" (Br.15); and (2) knew that Pillsbury was drawing against the Rogas funds and thus "acquiesce[d]" to such actions (Br.15–16, 56).

Contrary to appellants' claims, the USAO and the Commission consistently viewed the Rogas funds as fraud proceeds from the beginning. *See* A-53–62 (seeking the freeze of Rogas's funds "wherever located or by whomever held, and whether acquired before or after institution of this action," including by "attorneys-in-fact"); Crim. Dkt. [7] at 5–6 (indictment seeking forfeiture of "any and all property … derived from proceeds traceable to [Rogas's fraud]" including any property Rogas "transferred or sold to, or deposited with, a third party"). The USAO also expressly told Pillsbury *in November 2020*—only two months after Pillsbury's representation of Rogas had begun—that "both the Billed and Unbilled [Rogas] funds were subject to forfeiture" because "the source of those Account funds was $17 million in fraud proceeds from a tender offer of NS8 shares." A-272, 273. The USAO cautioned Pillsbury that those fraudulent proceeds "should therefore not be used to pay Rogas's legal

58

expenses," and that Pillsbury should "segregate those crime proceed funds." A-273.

Furthermore, neither the Commission nor the USAO "acquiesced" or otherwise consented to Pillsbury billing against the Rogas funds. Pillsbury did not tell the Commission that it had even *received* funds from Rogas until September 2022, let alone that it had been billing against them.[8] SPA-3. Indeed, the Commission could not have taken a position on Pillsbury billing against the funds until the summer of 2023, when Pillsbury first informed Commission counsel that it was billing against those funds and that Pillsbury intended to make a claim for the millions in funds it already had billed against. A-270–71. And once notified of Pillsbury's intentions, the Commission consistently opposed Pillsbury's efforts. *Id.*

The notion that the USAO "acquiesced" to Pillsbury billing against the funds is similarly counterfactual. The USAO warned Pillsbury in November 2020 not to spend the Rogas funds on legal fees because *all* the

---

[8] Pillsbury suggests (Br.13–14) that the September 2022 sworn accounting "made clear" to the Commission that Pillsbury was billing against the $3.6 million. But by stating that Rogas owned a $3.6 million unencumbered asset and that he separately owed a debt of $2 million for legal services, Pillsbury created the impression that they had *not* billed against the Rogas funds. *See* A-217, 222.

59

Rogas funds Pillsbury held (both billed and unbilled) were subject to forfeiture as fraud proceeds—and Pillsbury agreed not to spend those funds. A-272–73. And while the USAO did not seek forfeiture of any already-billed funds after it learned in 2023 that Pillsbury was billing against the Rogas funds, the USAO explained to Pillsbury that its decision not to pursue forfeiture of those funds "d[id] not … reflect a determination by the Government that, as a legal matter, the Billed Funds are not subject to recovery." A-267–68.

Appellants' claim (Br.16) that the USAO acknowledged that Pillsbury was a bona fide third-party recipient is also incorrect. The USAO's letter merely recounts that, during its November 2020 discussion with Pillsbury, *Pillsbury* indicated its belief that, "in *its* [(Pillsbury's)] view," Pillsbury was a bona fide third-party recipient of those funds. A-273. But even assuming *arguendo* that Pillsbury was a bona fide third-party recipient—because it was not aware that the funds were tainted when it first received them— Pillsbury could only claim ignorance about the source of the Rogas funds until November 2020. *See* A-273 (Pillsbury claiming to be a bona fide recipient for billed transactions "before that date [(November 2020)]"). Whatever red flags Pillsbury overlooked before that point, there was no

60

ignoring the USAO's statement in November 2020 that the proceeds came from Rogas's fraud, and thus Pillsbury could not claim to be a bona fide recipient of the remaining unbilled $3,612,601.76 past that point.

And appellants' argument (Br.56–57) that Pillsbury reasonably relied on the SEC's and USAO's "acquiescence" to its detriment ignores Pillsbury's own unclean hands in bringing about this situation. *See A. H. Emery Co. v. Marcan Prods. Corp.*, 389 F.2d 11, 18 (2d Cir. 1968) (explaining that a court may exercise wide range of discretion in refusing to aid litigant coming into court with unclean hands). Any inaction by the USAO or the Commission in not seeking earlier forfeiture of the Rogas funds is due directly to Pillsbury's privately billing against the Rogas funds for years while publicly claiming that the Rogas funds would (A-273)—and *did* (A-220)—remain untouched.

Finally, appellants' argument (Br.58–59) that affirming the district court will have "profoundly negative consequences" rests on several flawed premises. In arguing (Br.58) that affirming the order will "significantly undermine" a criminal defendant's Sixth Amendment rights, appellants do not accurately state the law, as their reliance on Justice Blackmun's *dissent* from *Caplin & Drysdale* makes clear. In the majority

61

opinion from that case, the Supreme Court held that a criminal defendant "has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way that that defendant will be able to retain the attorney of his choice." *Caplin & Drysdale*, 491 U.S. at 624–26. Nor may a defendant use funds tainted by his fraud to pay his legal bills. *Ahmed*, 72 F.4th at 395. The court's order adheres to that well-settled precedent, and thus does not break new or controversial ground.

Nor does the order have far-reaching implications for criminal defense attorneys, as appellants suggest. The order here simply recognized that, *in this case*, a law firm may not keep money for legal services rendered where the "unambiguous" language of the asset freeze encompasses such funds, and where the evidence uniformly shows that: (1) the firm was not a bona fide recipient of fraud proceeds because it did not provide value for the funds and must have known before billing against the funds that the source of those funds was the client's fraud; and (2) the client and law firm intended a retainer under which any unbilled funds remained the client's property. There is nothing troubling or far-reaching about that outcome.

## CONCLUSION

For the foregoing reasons, this Court should affirm the district court's order permanently barring Rogas from serving as an officer and director of a public company, and it should affirm the court's order directing Pillsbury to place $3,612,601.76 million in escrow for the benefit of defrauded investors.

Respectfully submitted,

JEFFREY B. FINNELL
Acting General Counsel

JEFFREY A. BERGER
Assistant General Counsel

 /s/ Paul G. Álvarez
PAUL G. ÁLVAREZ
Senior Appellate Counsel
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C.  20549
(202) 551-5038 (Álvarez)
alvarezp@sec.gov

July 2025

63

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B) because, according to the word processing program with which it was prepared (Microsoft Word for Microsoft 365), this brief contains 12,723 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f), and this brief complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (6) because the brief uses a 14-point proportionally spaced typeface.

                                               */s/ Paul G. Álvarez*
                                               PAUL G. ÁLVAREZ
                                               Senior Appellate Counsel
                                               Securities and Exchange Commission
                                               100 F Street, N.E.
                                               Washington, D.C.  20549
                                               (202) 551-5038 (Álvarez)
                                               alvarezp@sec.gov

CERTIFICATE OF SERVICE

I hereby certify that today, July 10, 2025, a copy of the foregoing brief was filed with the Court's ACMS system, thereby effecting service on all parties. I further certify that, upon notification from the clerk's office accepting the brief as filed, I will submit six identical paper copies to the Court.

                         */s/ Paul G. Álvarez*
                         PAUL G. ÁLVAREZ
                         Senior Appellate Counsel
                         Securities and Exchange Commission
                         100 F Street, N.E.
                         Washington, D.C.  20549
                         (202) 551-5038 (Alvarez)
                         alvarezp@sec.gov