# 25-0035-cv(L), 25-0036-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

UNITED STATES OF AMERICA,

*Intervenor,*

– v. –

ADAM P. ROGAS,

*Defendant-Appellant,*

PILLSBURY WINTHROP SHAW PITTMAN LLP,

*Appellant,*

PAUL G. KOROL,

*Defendant,*

NS8 FP, LLC, MVP 2020, LLC, ROGASSI ENTERPRISES, LLC,

*Relief-Defendants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR APPELLANTS

DAVID OLIWENSTEIN
PILLSBURY WINTHROP
  SHAW PITTMAN LLP
31 West 52nd Street
New York, New York 10019
(212) 858-1000

ANNE M. VOIGTS
PILLSBURY WINTHROP
  SHAW PITTMAN LLP
2250 Hanover Street
Palo Alto, California 94304
(650) 233-4500

*Attorneys for Appellants*



CP COUNSEL PRESS    (800) 4-APPEAL • (383662)

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

I.  The SEC Mischaracterizes the District Court's Decision Imposing a
    Lifetime Director and Officer Bar and Ignores the Distinction
    Between the Recalcitrant and the Remorseful..................................2

    A.  The SEC Mischaracterizes the District Court's Reasoning and
        Existing Case Law about "Repeat Offender" Status............................3

    B.  The District Court Incorrectly Assessed Mr. Rogas' Likelihood
        of Recidivism. ..........................................................................5

II. The SEC Offers No Compelling Rationale to Require Pillsbury to
    Return the Fee It Earned. ................................................................7

    A.  The SEC Misconstrues Governing New York Law on Advance
        Payment Retainers..........................................................................8

    B.  Mr. Rogas' Hypothetical Unvested Interest in a Potential
        Remainder Does Not Render the Advance Payment Subject to
        the Asset Freeze..................................................................15

    C.  Pillsbury Was a Good Faith Purchaser for Value. ..............................17

        i.   Pillsbury provided significant value in exchange for the
             Advance Payment. ..................................................................17

        ii.  There is no continuing duty to investigate the client's
             prior activities to assess the source of payment for legal
             fees. ..........................................................................20

    D.  Notwithstanding the SEC's Assertions to the Contrary, the
        Equitable Considerations Favor Pillsbury..........................................25

    E.  The SEC Fails to Address the Impact Its Positions Would Have
        on the Fair Administration of Criminal Justice..................................25

CERTIFICATE OF COMPLIANCE........................................................30

# TABLE OF AUTHORITIES

Page(s)

## Cases

*C.F.T.C. v. WeCorp, Inc.*,
  848 F. Supp. 2d 1195 (D. Haw. 2012) .................................................................19

*Caplin & Drysdale, Chartered v. United States*,
  491 U.S. 617 (1989) .................................................................17, 26, 27

*Diesel Props S.R.L. v. Greystone Business Credit II LLC*,
  2009 WL 89115 (S.D.N.Y. Jan. 14, 2009) ........................................................14

*HBE Leasing Corp. v. Frank*,
  61 F.3d 1054 (2d Cir. 1995) ................................................................18

*In re Caesars Ent. Operating Co., Inc.*,
  561 B.R. 420 (Bankr. N.D. Ill. 2015) .................................................................12

*In re Cooperman*,
  633 N.E. 2d 1069 (N.Y. 1994) .................................................................9

*In re Dewey & Lebouf LLP*,
  493 B.R. 421 (Bankr. S.D.N.Y. 2013) .................................................................8

*In re Level 8 Apparel LLC*,
  2023 WL 2940489 (Bankr. S.D.N.Y. Apr. 13, 2023) ....................................11

*Ruberto v. DeFilippo*,
  29 Misc. 3d 1236(A), 913 N.Y.S.2d 889 (N.Y. Civ. Ct. 2010) ...............9, 11, 16

*S.E.C. v. Apuzzo*,
  184 F. Supp. 3d 1 (D. Conn. 2016) .................................................................6, 7

*S.E.C. v. Bankosky*,
  2012 WL 1849000 (S.D.N.Y. May 21, 2012), *aff'd* 716 F.3d 45 (2d Cir. 2013) .................................................................4

*S.E.C. v. iShopNoMarkup.com, Inc.*,
  2012 WL 716928 (E.D.N.Y. Mar. 3, 2012) ........................................................4

*S.E.C. v. Patel*,
    61 F.3d 137 (2d Cir. 1995) ...............................................................3, 5

*S.E.C. v. SeeThruEquity, LLC*,
    2022 WL 171196 (S.D.N.Y. Jan. 19, 2022) ........................................4

*S.E.C. v. Shkreli*,
    2022 WL 541792 (S.D.N.Y. Feb. 23, 2022) ....................................6, 7

*Sandler v. Fishman*,
    157 A.D.2d 708 (2d Dep't 1990).......................................................13

*S.E.C. v. Ahmed*,
    72 F.4th 379 (2d Cir. 2023) .........................................................17, 27

*S.E.C. v. Quinn*,
    997 F.2d 287 (7th Cir. 1993) .............................................................17

*T&R Foods, Inc. v. Rose*,
    47 Cal. App. 4th Supp. 1 (1996) .......................................................12

*United States v. Parker*,
    439 F.3d 81 (2d Cir. 2006) ...............................................................11

<u>Constitutions</u>

United States Constitution
    Amendment V ...................................................................................29
    Amendment VI..................................................................................29

<u>Statutes and Codes</u>

United States Code
    Title 15, Section 78u(d)(2)...................................................................3

<u>Rules and Regulations</u>

New York Rules of Professional Conduct
    Rule 1.16(e)........................................................................................16

<u>Other Authorities</u>

Richmond, Douglas R., *Understanding Retainers and Flat Fees*, 34 J. Legal
    Prof. (2009) ....................................................................................9, 10

Robertson, Cassandra and Jesse Wynn, *Untangling Attorney Retainers from Creditor Claims*, 12 St. Mary's J. Legal Malprac. & Ethics (2021)...................10

## INTRODUCTION

The district court's imposition of a director and officer bar and its decision that Mr. Rogas' Advance Payment[1] is subject to the Asset Freeze conflicts with established law and should be reversed. The SEC offers no persuasive argument to the contrary.

*First*, the district court incorrectly imposed a lifetime director and officer bar by treating Mr. Rogas—who has no prior criminal history—as a repeat offender. The SEC downplays that error and asks this Court to disregard the crucial distinction courts have repeatedly drawn between recalcitrant, repeat offenders on the one hand and first-time defendants, like Mr. Rogas, who admit to and accept responsibility for their actions on the other. Because these are errors of law, this Court should reverse the district court's order.

*Second*, the district court impermissibly held that the Advance Payment was subject to the Asset Freeze and that money long since spent defending Mr. Rogas should nonetheless be returned. It did so because it incorrectly concluded as a matter of law that the Advance Payment remained within Mr. Rogas' control even though Pillsbury held it in Pillsbury's operating account. As Appellants explained, under New York law, the Advance Payment was an advance payment retainer and thus owned by Pillsbury—not Mr. Rogas. He retained no property interest in the funds

---

[1] Defined terms have the same meaning as in Appellants' Opening Brief.

1

after they were transferred and exercised no control over them. Furthermore, there were no "serious doubts" as to the legitimacy of the funds when Mr. Rogas paid them to Pillsbury. And Pillsbury—with DOJ's knowledge and assent—vigorously defended Mr. Rogas in exchange for the Advance Payment. Accordingly, Pillsbury was a good faith purchaser for value and entitled to keep the funds.

The SEC's arguments to the contrary rest on three faulty premises: (1) a misapplication of governing New York law on legal retainers, (2) a misreading of the plain text of the Asset Freeze, and (3) a factual narrative unsupported by the record. The district court's decision also raises significant policy concerns that the SEC fails to fully address, let alone resolve. In fact, the SEC's novel "continuing investigation" obligation introduces entirely new, and profound, problems of its own.

This Court should reverse.

## I. The SEC Mischaracterizes the District Court's Decision Imposing a Lifetime Director and Officer Bar and Ignores the Distinction Between the Recalcitrant and the Remorseful.

The district court abused its discretion by imposing a permanent director and officer bar on Mr. Rogas, a first-time offender who accepted responsibility for his conduct and demonstrated genuine remorse. The SEC offers no convincing counterargument. Neither the district court nor the SEC has identified any reason

that Mr. Rogas is likely to reoffend beyond the seriousness of his single course of misconduct—a factor that, standing alone, is insufficient to justify a lifetime bar.

Section 21(d)(2)'s required "unfitness" finding is necessarily prospective: the question is not whether the defendant committed serious misconduct in the past, but whether there is sufficient basis to conclude that he is likely to do so again in the future. *S.E.C. v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995). In defending the district court's order, the SEC doubles down on the legally flawed premise that the seriousness of the violation alone suffices—a position squarely at odds with *Patel* and its progeny. Opening Br. at 26-28. Because there is no legally sufficient basis in the record for finding that Mr. Rogas is likely to commit securities violations in the future, the lifetime bar should be vacated.

### A. The SEC Mischaracterizes the District Court's Reasoning and Existing Case Law about "Repeat Offender" Status.

The SEC contends that the district court did not impermissibly treat Mr. Rogas as a repeat offender, asserting that the court "stated" that Mr. Rogas is not a repeat offender and therefore did not misapply the second *Patel* factor. Response Br. at 30. That is not what the district court said (or did). The court characterized Mr. Rogas' conduct as "systematic and repetitive" and in describing him as "not (technically) a 'repeat offender,'" making it clear the court viewed him as a recidivist. SPA26. Tellingly, the SEC does not address the argument that the district court's mischaracterization of Mr. Rogas as a repeat offender tainted its *Patel* analysis as a

whole, particularly with regards to the likelihood of recidivism. Opening Br. at 29-32.

The SEC's argument that recurrent conduct within a single scheme satisfies *Patel's* "repeat offender" factor (Response Br. at 30) conflicts with existing precedent. In the Second Circuit, "repeat offender" status does not turn on whether a defendant's misconduct was ongoing or protracted. Rather, it attaches when the defendant "has committed *separate violations* of securities laws in the past." *S.E.C. v. SeeThruEquity, LLC*, 2022 WL 171196, at *4 (S.D.N.Y. Jan. 19, 2022) (emphasis added); *see also S.E.C. v. Bankosky*, 2012 WL 1849000, at *2 (S.D.N.Y. May 21, 2012), *aff'd* 716 F.3d 45 (2d Cir. 2013). In so doing, courts have distinguished between "multiple violations as part of a unified scheme" and "separate violations." *S.E.C. v. iShopNoMarkup.com, Inc.*, 2012 WL 716928, at *5 (E.D.N.Y. Mar. 3, 2012). And, as *SeeThruEquity* explained, "the term 'repeat offender' does not, in cases in this Circuit, describe multiple violations as part of a unified scheme, but the recidivist who repeats the violation *after prosecution*[.]" 2022 WL 171196, at *4. The SEC has no meaningful response to these decisions.

Rather than address the wealth of cases confirming that lifetime director and officer bars are "almost universally reserved for repeat offenders" (*see* Opening Br. at 32-34), the SEC ignores most of them, asserting (incorrectly) that there is "no legitimate basis" for this legal principle. Response Br. at 30. But the SEC offers no

contrary authority to support its claim. Instead, it cites only four director and officer bar cases in its entire brief, one of which did not even impose a lifetime bar. *See* Response Br. at 28-31.

### B. The District Court Incorrectly Assessed Mr. Rogas' Likelihood of Recidivism.

The district court identified no legally sufficient factual basis to conclude that Mr. Rogas is likely to commit future securities law violations. That's because there was none. Instead, the court relied almost exclusively on the seriousness of Mr. Rogas' past conduct—pointing to the scheme's duration and the amount of money involved. SPA28-29. In defending the court's decision on appeal, the SEC does the same. But, as *Patel* confirmed, courts must "articulate the factual basis for a finding of the likelihood of recurrence," and not merely rely on the severity of the instant misconduct. *Patel*, 61 F.3d at 141-42; *see also* Opening Br. at 26-32 (citing cases). The district court did no such thing.

The SEC attempts to bolster the district court's analysis after the fact, pointing to limited post-arrest conduct by Mr. Rogas, including his admitted violation of the Asset Freeze when he improperly dispersed funds that SVB unilaterally sent to him in contravention of the court's order in April 2021. Response Br. at 32. But when Mr. Rogas was made aware that the SVB distribution violated the Asset Freeze, he acknowledged the violation, cooperated in returning the funds, and did not engage in any comparable conduct at any point thereafter. A80; A131. That single, isolated

mistake does not demonstrate any likelihood that Mr. Rogas would commit future securities law violations—particularly in light of his guilty plea, sentence, and cooperative resolution of this civil case.

Ultimately, the SEC cannot avoid the fact that the district court failed to even acknowledge Mr. Rogas' acceptance of responsibility. Indeed, the two cases on which the SEC relies most heavily—*S.E.C. v. Shkreli* and *S.E.C. v. Apuzzo*—underscore the court's error. In both cases, the court found that the defendant had committed egregious violations but had refused to accept responsibility and demonstrated no recognition of wrongdoing. In *Shkreli*, for example, the court concluded that the defendant "demonstrated either an inability or an unwillingness to truly recognize the 'wrongfulness'" of his conduct. *S.E.C. v. Shkreli*, 2022 WL 541792, at *9 (S.D.N.Y. Feb. 23, 2022). And the district court found that Apuzzo demonstrated a complete "failure and inability to articulate why his conduct was wrong," showed no "contrition," and testified with "obvious lack of candor." *S.E.C. v. Apuzzo*, 184 F. Supp. 3d 1, 9-10 (D. Conn. 2016).

Not so here. Mr. Rogas has repeatedly accepted and acknowledged responsibility for his actions—in his plea agreement and allocution (DOJ Dkt. 59 at 22), in his sentencing submissions (DOJ Dkt. 67-1), and through his cooperation with both the SEC and DOJ. *See* A278; A291; DOJ Dkt. 86 ¶ 51; *see also* Opening Br. at 10-11. While the SEC ignores those facts, the law does not. They are among

the most significant that courts must consider in determining the proper duration of a director and officer bar. Neither the district court nor the SEC has cited any decision from this Circuit imposing a lifetime bar on a first-time offender who has accepted responsibility and poses no future risk.

These are not minor "factual distinctions" (*see* Response Br. at 31) without a difference as the SEC seems to argue—*Shkreli, Apuzzo,* and the other cases the court relied on fundamentally differ from Mr. Rogas' case. *See* Opening Br. at 35-37. The SEC's claim that Mr. Rogas' position rests on an "erroneous premise that if a different court declines to issue a lifetime bar on different facts, it necessarily means that the district court abused its discretion in imposing a lifetime bar here," (Response Br. at 32) misstates Mr. Rogas' position and ignores the important distinctions between repeat offenders who steadfastly refuse to acknowledge any wrongdoing, and those who accept responsibility for their actions.

## II. The SEC Offers No Compelling Rationale to Require Pillsbury to Return the Fee It Earned.

Controlling law and the record below establish that: (1) before the Asset Freeze was imposed, Mr. Rogas paid Pillsbury $4 million in advance for legal services in connection with specific legal issues expected to arise from his employment with NS8; (2) the default form of retainer under governing New York law is an advance payment retainer; (3) nothing in the record suggests the parties deviated from treating the Advance Payment as an advance payment retainer, let

alone did so intentionally; (4) Mr. Rogas retained no property interest in the funds; (5) the Asset Freeze does not apply to Pillsbury's property; (6) Pillsbury was a good faith purchaser of the Advance Payment in exchange for services of value; (7) the SEC misstates the facts, as, despite its professed ignorance that Pillsbury was being compensated from the Advance Payment (and its suggestions that Pillsbury somehow acted improperly), *both* DOJ and the SEC knew about the Advance Payment, knew that Pillsbury was being compensated therefrom, and, *as the SEC also knew*, Pillsbury and DOJ had reached agreement that Pillsbury would keep more than $2 million in fees from those funds; and (8) while the Court need not reach (and should not endorse) them, the SEC's positions would, if adopted, cause profound harm to criminal and civil defendants alike, as well as to the defense bar, and infringe on their constitutional right to counsel.

## A. The SEC Misconstrues Governing New York Law on Advance Payment Retainers.

The SEC's entire argument that the Engagement Letter created a security retainer, not an advance payment retainer (Response Br. at 42-53) misapplies governing law. Specifically, the SEC argues that the terms of the Engagement Letter and extrinsic facts do not provide enough evidence to establish an advance payment retainer. But New York law dictates that an advance payment retainer is assumed.

In New York, an advance payment retainer is the *standard* form of retainer payment. *In re Dewey & Lebouf LLP*, 493 B.R. 421, 429 (Bankr. S.D.N.Y. 2013)

(citing *Ruberto v. DeFilippo*, 29 Misc. 3d 1236(A), 913 N.Y.S.2d 889, 891 (N.Y. Civ. Ct. 2010)); *see also* NYSBA Op. Nos. 570, 816, 983. Accordingly, any retainer is considered to be an advance payment retainer unless the parties expressly deviate and create a different kind. *See*, *e.g.*, *Ruberto*, 913 N.Y.S.2d 889, 892 ("[A]bsent a 'security retainer' being specifically created in the retainer agreement, New York treats all such legal fee payments as an 'advance payment retainer.'" (citation omitted)). The SEC's position would turn that test on its head. Here, Appellants need not show that they intentionally sought to create advance payment retainer; instead, the SEC must show that they expressly deviated from creating such a retainer. It has not and it cannot.

The SEC's argument that the Engagement Letter creates a security retainer is based almost entirely on a single academic article that does not discuss, analyze, or apply New York law on advance payment retainers. Instead, it focuses on how other jurisdictions classify and regulate attorney retainers and how, in the author's view, these standards *should* be applied universally. Nonetheless, the SEC repeatedly characterizes Douglas R. Richmond's 2009 article, *Understanding Retainers and Flat Fees*, 34 J. Legal Prof. 113 (2009) as dispositive. Mr. Richmond's reference to New York law is limited to (1) Rule 1.5(b)'s requirement that lawyers enter into written engagement letters, and (2) a discussion of *In re Cooperman*, 633 N.E. 2d 1069, 1071 (N.Y. 1994), regarding the permissibility of non-refundable retainers.

*See Richmond, supra* at 125, 129. Neither are relevant here. *Far* more probative is Mr. Richmond's acknowledgement that "[s]ome states" allow attorneys to receive an "advance payment retainer," including Illinois, which—like New York—characterizes such retainers as "a present payment to a lawyer in exchange for a commitment by the lawyer to provide future legal services *that becomes the lawyer's property immediately upon payment*." *Id.* at 135-36 (emphasis added).

Mr. Richmond's academic criticism of New York and Illinois retainer law provides no basis to ignore controlling law in this case. It is an argument about what the law should be, not a description of what it actually is. As a subsequent article explains, Mr. Richmond *argues* that New York's and Illinois' rules are bad policy because, he believes, "making advance payment retainers refundable necessarily transforms them into security retainers." Cassandra Robertson and Jesse Wynn, *Untangling Attorney Retainers from Creditor Claims*, 12 St. Mary's J. Legal Malprac. & Ethics 142, 153 (2021). But, as Robertson and Wynn point out, there was a reason for this rule: they "permitted this structure, primarily as an attempt to shield the funds from claims by client creditors." *Id.* (citations omitted).

Moreover, in 2013, the NYSBA reaffirmed that "advance payment retainers" are permissible under New York rules and that the funds immediately belong to the attorney. NYSBA Op. No. 983 at ¶¶ 4-5 (2013). The NYSBA went on to explain, in the context of parties who seek to designate unused advance payment retainer funds

10

towards future obligations, that other jurisdictions characterize such retainers differently, describing them as "special," "specific," or "security" retainers. *Id.* ¶ 3 n.2. Specifically citing Mr. Richmond's article, the NYSBA stated that using Richmond's analysis, "the present inquiry [would] concer[n] a proposed security retainer." *Id.* But under New York law, such payments remained classified as an advance payment retainer.

The handful of cases cited by the SEC likewise miss the mark. For all of the reasons outlined above, the bankruptcy court's invocation of his article for background in *In re Level 8 Apparel LLC* is misplaced, and its treatment of New York law should be viewed with skepticism. *See* 2023 WL 2940489, at *19 (Bankr. S.D.N.Y. Apr. 13, 2023). *Level 8*'s facts are also fundamentally different. The engagement letter there expressly stated that the retainer was an "estimate," and the client agreed to "adjust the size of the retainer" based upon future fluctuations in anticipated fees. *Id.* at *21. Moreover, the parties there stipulated to an order at the outset of proceedings that specifically provided that the retainer would be applied as a "credit" for fees approved by the bankruptcy court at the conclusion of litigation. *Id.* Further afield, *United States v. Parker* does not apply or even rely on New York law. 439 F.3d 81, 100 n.18 (2d Cir. 2006) (addressing federal common law for CJA attorneys). And *Ruberto* merely stands for the proposition that an attorney could not

discharge in bankruptcy his "legal and ethical obligation" to return unearned fees. 913 N.Y.S.2d at 892.

Here, the language of the Engagement Letter did not expressly deviate from New York's default treatment. The SEC claims that the inclusion of a "replenishable" $15,000 retainer suggests that the parties intended to create a security retainer. No New York court has reached that conclusion, and courts in other jurisdictions have found this consistent with an intent to create an advance payment retainer. *See, e.g., In re Caesars Ent. Operating Co., Inc.*, 561 B.R. 420, 438, 437-39 (Bankr. N.D. Ill. 2015) (applying Illinois law) ("[r]equiring a client to 'replenish' a retainer suggests that the retainer is instead an advance payment retainer;" the engagement letter's "requirement that the [client] 'replenish' the retainer, shows an intent to create an advance payment retainer" (citations omitted)); *T&R Foods, Inc. v. Rose*, 47 Cal. App. 4th Supp. 1, 7 (1996) (a $25,000 retainer that "is to be replenished monthly…clearly shows that [it] was not a classic retainer, but rather an advance payment retainer").[2] And the Engagement Letter here spoke specifically about contemporaneous services being provided in connection with Mr. Rogas' employment with NS8 and any issues "*arising* therefrom." A196-200 (emphasis added).

---

[2] While California and Illinois treat attorney retainers differently then New York in important ways, their interpretation of retainer language is relevant here.

The SEC complains that Appellants offer no contemporaneous extrinsic evidence that they intended to create an advance payment retainer. This ignores the fact that the Advance Payment was sent to and held in Pillsbury's operating account and not in escrow, the language of the Engagement Letter, and the legal background against which the parties acted. A257. At the same time, the SEC simultaneously asserts that extrinsic evidence cannot be introduced. Response Br. at 50. The SEC cannot have it both ways. But, in any event, Appellants need not provide evidence they created an advance payment retainer (which they have). The SEC must supply evidence to the contrary (which it has not).

The SEC also suggests that NYSBA Opinion No. 816 obligates an attorney to contemporaneously document that a payment for legal fees was an advance payment retainer. But the Engagement Letter's language was consistent with an advance payment retainer (as confirmed by the case law cited above), and Mr. Rogas' sworn statement makes clear that he understood that the Advance Payment was an advance payment retainer. Indeed, when the Engagement Letter was revised to address a conflicts issue, neither Pillsbury nor Mr. Rogas saw a need to change the retainer language, because it already reflected their understanding that the Advance Payment was an advance payment retainer not subject to attachment by Mr. Rogas' creditors.

Extrinsic evidence may be considered to clarify the intent of the parties. *See*, *e.g.*, *Sandler v. Fishman*, 157 A.D.2d 708, 709 (2d Dep't 1990) (affirming admission

of "evidence of the parties' intent and conduct to clarify the objective" of a partnership agreement); *Diesel Props S.R.L. v. Greystone Business Credit II LLC*, 2009 WL 89115, at *3 (S.D.N.Y. Jan. 14, 2009) (applying New York law). Here, the evidence of the parties' intent, if required, establishes that the parties *did not intentionally deviate* from standard New York practice. The Advance Payment was deposited directly into Pillsbury's operating account. A256-57. It was never held in escrow. A256. Pillsbury treated the funds as its own property, and both parties to the transaction expressly stated, under oath, that the Advance Payment was intended to—and did—function as advance payment for the provision of specific legal services by Pillsbury. A255-65. Moreover, both DOJ and the SEC knew about the Advance Payment and that Pillsbury was taking its compensation from it. A260; A267. Indeed, Pillsbury and the DOJ reached an agreement that Pillsbury would keep more than $2 million in fees from those funds. A260; A267. The SEC knew of this agreement and specifically inquired as to the remainder as late as June 30, 2023. A258.

Ignoring the ample extrinsic evidence of how the Advance Payment was actually treated, the SEC directs the Court to a September 2022 "accounting." *See* Response Br. at 19, 36. This document—a one-page letter sent to the SEC during settlement negotiations—does not require a finding or even support the idea that the Advance Payment was not treated as an advance payment retainer. Pillsbury's letter

14

included an attachment containing financial information previously provided by Mr. Rogas himself to the Probation Office, which had identified that Mr. Rogas had paid Pillsbury a significant retainer (although not the full $4 million), that Mr. Rogas understood that he had incurred approximately $2 million in legal fees, and that Pillsbury was accounting for the use of such funds to determine the amount of any remainder that would be paid back to Mr. Rogas. A212-223.

The document was intended to advise the SEC of the information that Mr. Rogas had previously provided to the Probation Office. It did that. It does not retroactively change the character of a payment made two years prior, directly into Pillsbury's operating account to pay in advance for the provision of specific legal services. Opening Br. at 49 n.11. Furthermore, ten months later, the SEC contacted Pillsbury specifically to confirm that Pillsbury had been working against the Advance Payment and understand how much remained. A258; A274-77. Any assertion that the SEC understood the September 2022 letter to alter how the Advance Payment had actually been treated or to otherwise prove it was a security retainer is flatly contradicted by the SEC's own subsequent actions.

### B. Mr. Rogas' Hypothetical Unvested Interest in a Potential Remainder Does Not Render the Advance Payment Subject to the Asset Freeze.

The SEC also contends that Mr. Rogas retained an interest in any "unbilled funds" when the Asset Freeze was implemented, thus subjecting such funds to the

freeze. Response Br. at 37; 43-56. Again, this is contrary to established New York law.

The Advance Payment became Pillsbury's property the moment it was transferred. Opening Br. at 51 (collecting New York cases). As NYSBA Opinion 816 confirms, New York's unique advance payment retainer regime is intended to divest the client of any remaining property interest, thus protecting their ability to retain counsel by placing such funds beyond the reach of "claims of the client's creditors." As Opinion 816 acknowledges, at the conclusion of the representation, unearned fees must be "promptly returned" to the client. But that merely affirms New York's prohibition on "negotiat[ing] a nonrefundable advance payment retainer" (NYSBA Op. No. 816), and the ethical obligation to "promptly refund[] any part of a fee paid in advance that has not been earn[ed]." N.Y. Rule of Prof. Con. 1.16(e); *see also Ruberto*, 913 N.Y.S.2d at 891 (while "ownership of the fee does not remain with the client" the attorney cannot escape his "obligation to return the unearned fee").

Stated differently, Mr. Rogas retained no cognizable interest in the Advance Payment, and therefore no portion of the funds fell within the Asset Freeze.[3] At most,

---

[3] The Asset Freeze applies only to "property of" or held "in the name of, for the benefit of, or under the control of" Mr. Rogas (or the Relief Defendants). Opening Br. at 50.

Mr. Rogas had a hypothetical, unvested future interest in any remainder, which never came to fruition because there was no remainder. A316. Pillsbury exceeded $4 million in fees incurred long ago.

### C. Pillsbury Was a Good Faith Purchaser for Value.

Even assuming that the Advance Payment came from misappropriated funds, Pillsbury remains entitled to compensation for the legal services it provided as a good faith purchaser for value. Opening Br. at 54-55. The SEC contends that Pillsbury neither "gave value in exchange for" the Advance Payment nor "lacked notice" as to the "provenance" of the funds.[4] Response Br. at 36. The SEC is wrong on both counts.

i.    Pillsbury provided significant value in exchange for the Advance Payment.

The assertion that Pillsbury provided no value is wrong as a matter of both law and fact. Pillsbury delivered five years (and counting) of sophisticated, comprehensive legal representation across simultaneous criminal prosecution and civil enforcement actions, as well as multiple civil lawsuits paid for in part by the Advance Payment. Pillsbury attorneys spent thousands of hours in furtherance of

---

[4] The SEC cites *S.E.C. v. Ahmed*, 72 F.4th 379, 395 (2d Cir. 2023), *S.E.C. v. Quinn*, 997 F.2d 287, 289 (7th Cir. 1993), and *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 626 (1989), for the general proposition that a defendant cannot use "tainted" funds for his legal defense. None apply here. *See* Section II.E, *infra*.

17

this legal representation, exerting substantial effort to achieve resolution in three separate lawsuits.

The SEC nonetheless contends that because some of those services were provided after the Asset Freeze was entered, the Advance Payment is subject to disgorgement. Response Br. at 36-37. But in so arguing, the SEC cites no relevant legal authority. The one case the SEC does invoke involved civil RICO and common law fraud claims. *See HBE Leasing Corp. v. Frank*, 61 F.3d 1054 (2d Cir. 1995). It does not touch on the extent of a lawyer's obligation to investigate the provenance of funds used to pay a legal fee.

The notion that Pillsbury had not "earned" the Advance Payment by the time the Asset Freeze was implemented is flatly inconsistent with both the nature of an advance payment retainer and New York law. By definition, an advance payment retainer is remitted to pay, in advance, for specific contemplated legal services that will be provided moving forward. The funds become the property of the attorney upon payment. This is no mere formality; the arrangement is specifically designed to empower clients to retain counsel and place the funds beyond the reach of creditors. NYSBA Op. No. 816. If the SEC were correct that such funds remain subject to forfeiture, disgorgement, or clawback, it would override New York's authority to apply its own law to state issues (such as the attorney-client relationship) and defeat the express purpose of such rules.

Furthermore, the SEC's self-serving gloss on Pillsbury's "promise to perform future services" (Response Br. at 36) is factually wrong. Pillsbury was *performing* services for Mr. Rogas in real time as the Engagement Letter was executed—carrying out the comprehensive representation it had been engaged to provide and paid for in advance. That it continued to do so does not change the result. Pillsbury had not promised to represent Mr. Rogas in the future, it was *already representing* him and actively performing work. Indeed, the SEC acknowledges that Pillsbury had already provided significant services of value for Mr. Rogas by the time the Asset Freeze was entered. In particular, the SEC asserts (for the first time) that it did not pursue nearly $400,000 of the Advance Payment because (the SEC unilaterally concluded that) Pillsbury had already billed as much before Mr. Rogas' assets were frozen. Response Br. at 37. In short, even under the SEC's own assessment, Pillsbury had already provided Mr. Rogas with significant value *before* the Asset Freeze was entered.

*C.F.T.C. v. WeCorp, Inc.*, 848 F. Supp. 2d 1195, 1202 (D. Haw. 2012), confirms that "[p]erforming services in exchange for compensation is a sufficient claim of ownership to preclude relief defendant treatment." Notably, there, the client paid in advance $70,000 in undisputedly tainted funds, and the CFTC argued that the advance payment was subject to disgorgement because the law firm did not perform work on behalf of the client. *Id.* at 1197, 1202. The court rejected that

19

argument, finding that the firm had performed some legal services on behalf of the client—even though based upon the description of the services in the opinion, the law firm there had done far less than the SEC acknowledges Pillsbury did here.

ii.    <u>There is no continuing duty to investigate the client's prior activities to assess the source of payment for legal fees.</u>

There is no dispute that New York law governs Pillsbury's obligations in connection with retainers received from clients. *See* Response Br. at 53. And New York law is clear that no lawyer is obligated to investigate the means by which his client pays unless the lawyer has "serious doubts" about the legitimacy of such funds. NYCBA Op. No. 2018-4 II(a). No such "serious doubts" existed at the time the Advance Payment was made.

To sidestep controlling law, the SEC misdirects the Court to what *the SEC* purports to know now, in 2025, rather than what *Pillsbury* reasonably understood on September 9, 2020. The relevant information is what was known at the time of payment, not what might be known with the benefit of hindsight. Pillsbury understood Mr. Rogas to be an established, reputable, successful software developer and entrepreneur with no criminal history. A256. The funds were sent from an entity unconnected to NS8, Inc. A256-257. That company, PhutureCorp, was never named as a Relief Defendant in the SEC's civil action.

The SEC next claims that Pillsbury was obligated to continue investigating Mr. Rogas and the source of Advance Payment throughout the entire representation.

20

Response Br. at 39-40. According to the SEC, such a continuing investigation should have led Pillsbury to uncover purported "red flags" about the source of payment (Response Br. at 39), at which time, presumably, the SEC would have Pillsbury notify DOJ and the SEC of its findings and return the funds. Again, New York law imposes no such burden on attorneys.

The SEC relies on NYCBA Op. No. 2018-4, which addresses "[a]ssisting in a suspicious transaction," claiming that the "duty of inquiry…continues throughout the representation." *See* Response Br. at 40. But this ethics opinion does not concern attorney obligations in connection with the receipt of payment for legal fees. Rather, it addresses situations where the attorney is actively assisting the client in completing a transaction, and the attorney becomes aware of the client's active use of the attorney's services to commit "unlawful conduct." NYCBA Op. No. 2018-4 at II.a, IV. Nothing of the sort occurred here.

The recently published ABA Formal Opinion 513 helps clarify that critical distinction. Formal Opinion 513 instructs that the Model Rules of Professional Conduct "neither require a lawyer to fulfill a gatekeeper role, nor…permit a lawyer to engage in the reporting that such a role could entail." ABA Formal Op. No. 513 (April 23, 2024) at 5. Even where the facts and circumstances unique to the representation give rise to the obligation for counsel to undertake a reasonable inquiry into the source of client payment, that reasonable inquiry "need not resolve

all doubts." *Id.* at 13. *Rather, the attorney may undertake the representation so long as the attorney concludes "that the lawyer's services are unlikely to be used to commit or further criminal or fraudulent activity." Id.* at 12, 13 (emphasis added).[5] This comports with the ABA's own standard that an attorney can accept funding from a client unless there is a "high probability" that such funds are illegitimate. *Id.* at 5; *see also* Opening Br. at 53.

As to the SEC's purported "red flags," not only did they arise after Pillsbury received the Advance Payment, but the SEC also misrepresents their import. For the first 24 months of Pillsbury's representation, while the SEC matter was stayed, Pillsbury had only sporadic interaction with the SEC and dealt almost exclusively with DOJ on the criminal matter. DOJ never told Pillsbury that it believed the Advance Payment was made with stolen funds. In November 2020, DOJ took the position (in active litigation) only that such funds *could* be subject to criminal forfeiture. A272. But Pillsbury did not promise not to utilize the funds as work progressed. Based on DOJ's own record of communications, Pillsbury merely agreed to examine whether other sources of funding existed. A-273. Ultimately, there were none.

---

[5] Beyond being legally infirm, the SEC's "continuing investigation" standard would have profoundly negative consequences for defendants and the defense bar. *See infra*, Section II.E.

Moreover, notwithstanding the SEC's attempts to downplay these facts, DOJ consented to Pillsbury being compensated from the Advance Payment for roughly $2 million in criminal defense fees. A260; A267. DOJ twice represented in letters (one of which was solicited by the SEC) that it would not contest Pillsbury's entitlement to such compensation. A259-260; A267; A272. The SEC was incontrovertibly aware of DOJ's assent and even sought to confirm the specific amount of the remainder that would be available to be returned to Mr. Rogas' victims. A258; A274-77. Then, 35 months later, the SEC abruptly decided to challenge the position DOJ and Pillsbury had agreed to—without prior objection by the SEC.

The remaining events recounted by the SEC were not "red flags." Yes, Mr. Rogas dispersed funds that SVB sent him in contravention of the district court's asset freeze without the knowledge or awareness of counsel. A80. But SVB did not send Mr. Rogas those funds until March 2021, and Pillsbury did not become aware of such developments until the SEC informed Pillsbury months later. And then Pillsbury worked to resolve the matter. A80; A131. More importantly, that later dispersion of funds after the Asset Freeze was entered has no bearing on whether a payment made before it was entered violated the freeze. *Contra* Response Br. at 41. The Advance Payment no longer belonged to Mr. Rogas when the Asset Freeze was entered. The SVB funds did.

Nor is the SEC's reliance on its own "tracing" of the funds four years after the fact relevant. There is no basis for such a "perfect hindsight" standard. Moreover, if the SEC can rely on its own post-hoc analysis, then certainly Pillsbury is entitled to rely on the DOJ's inability to determine that the Advance Payment was made with the proceeds of fraud and its designation instead as a "substitute asset." The SEC tries to minimize this by claiming that a "substitute asset" designation is merely a tool that the government uses to obtain forfeiture of assets placed beyond its reach by comingling. Response Br. at 42. But this ignores what DOJ represented to the district court in connection with forfeiture:

> As set forth in the Declaration of Deputy United States Marshal John Calabria, the United States *has not been able to locate, obtain or collect any assets traceable to the proceeds of the defendant's offenses* despite the exercise of due diligence in investigating the assets of the defendant.

DOJ Dkt. 90 ¶ 6 (emphasis added); *see also* A245; DOJ Dkt. 86 ¶¶ 91-95. If the DOJ, with all of it investigative tools, could not determine in late July 2023 that the Advance Payment had been made with tainted funds, it strains credulity to claim Pillsbury should have reached the same conclusion at the outset of its representation of Mr. Rogas nearly three years earlier.

Simply put, Pillsbury was a good faith purchaser of the Advance Payment and is entitled to the funds for compensation for the valuable services it provided—and continues to provide—to Mr. Rogas.

### D. Notwithstanding the SEC's Assertions to the Contrary, the Equitable Considerations Favor Pillsbury.

The SEC largely dismisses the equitable considerations raised by its conduct during the underlying case. It should not. It does not address the fact that the government—which is, after all, one executive branch—knew about the Advance Payment for years and allowed Pillsbury to proceed with the express understanding that Pillsbury would be compensated from those funds. Only after Pillsbury had represented Mr. Rogas for three years, incurred millions in legal fees, and negotiated resolutions to DOJ's prosecution and the SEC's civil enforcement action, did the SEC—for the first time—abruptly change its position, claiming that Pillsbury was entitled to nothing. The SEC's prior knowledge, acquiescence, and sudden change of position significantly prejudiced Appellants.

### E. The SEC Fails to Address the Impact Its Positions Would Have on the Fair Administration of Criminal Justice.

Appellants explained how, if allowed to stand, the district court's order will significantly and negatively impact the administration of criminal and civil justice. Opening Br. at 58-59. The SEC not only fails to address those concerns, but its positions also raise even more troubling ramifications. This Court should reject those arguments because they will infringe on defendants' rights and undermine the criminal defense bar.

The SEC endorses a novel standard that would impose a never-ending obligation on the part of lawyers to investigate their own clients and, the moment that a lawyer discovers some evidence of wrongdoing that could mean the lawyer was paid with tainted funds, to stop work and proactively inform the government. According to the SEC, the fact there may have been no concerns when payment was actually received is meaningless. Instead, the SEC takes the position that lawyers must *continue* investigating their clients and if, at some point, an attorney learns that the source of payment may be tainted, that lawyer must: (1) immediately cease work and stop accepting compensation, even for work already completed; (2) notify the government and court that funds paid to the lawyer may be tainted (and in so doing provide evidence to the government of the client's guilt); (3) return any legal fees previously paid to the lawyer; and (4) ask the court for permission to be paid, which will no doubt be denied. In other words, the SEC asks this Court to endorse a standard that subjugates the rights of the accused, conscripts defense counsel as unwilling agents promoting the government's case and turns lawyers into witnesses against their clients.

The SEC claims that such fears are unfounded because as *Caplin & Drysdale* explains, a criminal defendant has "no right" to use another's money for his legal defense, 491 U.S. at 624-46, and a defendant may not use "funds tainted by his fraud

to pay his legal bills," *Ahmed*, 72 F.4th at 379; *see* Response Br. at 35. Neither case applies, let alone warrants affirmance here.

*Ahmed* involved a defendant's request to unfreeze assets plainly covered by the asset freeze to pay his lawyers. And in *Caplin & Drysdale,* Christopher Reckmeyer, the criminal defendant, was a notorious drug trafficker with no plausible source of legitimate income. 491 U.S. at 617-19. It was facially evident he had no legitimate means to retain counsel, and the district court had already entered a restraining order against Reckmeyer when he transferred $25,000 to legal counsel. *Id.* at 619-621. Those funds were placed into escrow by the law firm, which continued to represent Reckmeyer despite knowledge of such facts. *Id.* Then, shortly after Reckmeyer was indicted, he moved the district court to modify its earlier restraining order to allow him to use "restrained assets" to pay legal counsel. *Id.* at 621. The district court denied the order, from which Reckmeyer appealed. Those facts are completely inapposite from those before the Court—Mr. Rogas transferred funds before the inception of any legal process, Pillsbury understood Mr. Rogas to be a successful businessman (certainly not a drug dealer), and Pillsbury represented Mr. Rogas for years with the government's knowledge and acquiescence, Pillsbury agreed with the DOJ that Pillsbury could be compensated from the Advance Payment, and the SEC—fully aware of all of this—did not object until almost three

27

years later, after nearly all legal services had been performed, when it demanded that Pillsbury be paid nothing for years of work.

The SEC does not meaningfully deny that Pillsbury provided valuable legal services to Mr. Rogas for several years, that those services were provided in good faith and consistent with Pillsbury's obligations to its client, or that Pillsbury accepted the Advance Payment before any legal process or the Asset Freeze was implemented. Nor does it really contest that Pillsbury received assurances from DOJ entitling Pillsbury to compensation from the funds, or that Pillsbury disclosed the existence of the Advance Payment long before the SEC objected. Yet, despite all of that, the SEC erroneously claims the law required Pillsbury to cease representing its client if and when at some future point it learned from any source (including from its own client) that the Advance Payment had been the product of a fraud. Such a standard cannot be reconciled with a just legal system that respects the rights of the accused to a defense and to the assistance of counsel in mounting that defense.

The penultimate paragraph of the SEC's response asserts that there are no troubling ramifications to its novel position because "in this case" the Asset Freeze clearly and unambiguously resolves every issue on appeal in the SEC's favor. It does not, for the reasons addressed here and in Appellants' Opening Brief. The Court should decline the SEC's invitation to invent new legal standards that would

demonstrably harm defendants, undercut their Fifth and Sixth Amendment rights, and eviscerate the protections afforded by the attorney-client relationship.

## CONCLUSION

For the reasons set forth here and in Appellants' Opening Brief, this Court should reverse the two district court orders that are the subject of this appeal and remand with instructions consistent with the relief sought herein.

Dated: July 31, 2025

Respectfully submitted,

*/s/* Anne M. Voigts
Anne M. Voigts
PILLSBURY WINTHROP SHAW PITTMAN LLP
2550 Hanover Street
Palo Alto, CA 94304-1115
Telephone: (650) 233-4500
anne.voigts@pillsburylaw.com

David Oliwenstein
PILLSBURY WINTHROP SHAW PITTMAN LLP
31 West 52nd Street
New York, NY 10019
Telephone: (212) 858-1000
david.oliwenstein@pillsburylaw.com

*Attorneys for Defendant-Appellant Adam P. Rogas and Appellant Pillsbury Winthrop Shaw Pittman LLP*

## CERTIFICATE OF COMPLIANCE

This principal brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and L.R. 32.1(a)(4). This brief contains 6,855 words, excluding the parts of the motion exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman.

Dated: July 31, 2025

　　　　　　　　　　　　　　　 /s/ Anne M. Voigts
　　　　　　　　　　　　　　　 Anne M. Voigts